1841.

Smedberg
v.
More.

SMEDBERG and others, *appellants*, and MORE and
others, *respondents*.

Whether the *vendor* of land is entitled to a decree for a *specific performance*
against the *purchaser*, under the circumstances hereinafter detailed, *quere*?
The contract bears date 15th December, 1836. The vendor agreed to sell
the premises for $10,000, to be paid as follows: the purchaser to obtain
the assignment of a judgment held by a third person against the vendor,
and to retain the same *until the vendor executed to him a deed for the premises*,
and then to pay the balance of what should be left of the sum of $4000,
after deducting the amount of the judgment, and the residue of the $10,-
000, to be paid in four instalments, the first payment to be made on the
1st December, 1837. The purchaser to enter into immediate possession,
and no interest to be demanded on the judgment, provided the vendor ex-
ecuted the deed. The defendant entered and within seventeen days after
the contract, obtained the assignment of the judgment, and paid to the
vendor the balance of $4000, after deducting the amount of the judgment.
The premises were greatly out of repair and required the expenditure of
a large sum of money to render them profitable. On the 24th *July*, the
purchaser demanded a deed, and on 27th *September*, tendered full per-
formance on his part, and repeated the demand for a deed, and not re-
ceiving it, he on the 2d *October*, gave notice of abandonment of the con-
tract, and tendered a delivery of possession of the premises, reserving the
right to take out hides put by him into vats in a tannery on the premises,
when they should be fit to be removed. After which, on the 12th *Octo-
ber*, the vendor tendered to the purchaser a deed of the premises, execut-
ed in due form, which the purchaser refused to accept.*

APPEAL from Chancery. This was a bill to obtain
a decree for the specific performance of a contract
for the purchase of real estate, filed by the *vendors* against
the *purchaser*. On 15th December, 1836, a contract was
entered into between *Robert L. More* and *William F.
Brackney*, under their hands and seals, expressed to be a
contract between *Robert L. More, Samuel More,* and *An-*

---

* The question in this case is stated as an *open question*, because the *Vice-
Chancellor*, before whom the cause was originally heard, *dismissed* the bill,
the *Chancellor* on appeal *sustained* it, and the court for the correction of er-
rors were *equally divided* upon the question of reversal: 12 members of the
court being for *reversal* and 12 for *affirmance* of the decree of the Chancel-
lor.

*drew More* of the first part, and *William F. Brackney* of the other part, to which Robert L. More affixed the name of *Robert L. More & Co.* (Robert, Samuel and Andrew being partners, doing business under that name.) By the contract in question, the parties of the first part agreed for the sum of $10,000, to sell to Brackney a piece of land of about seven acres, on which was a *tannery*, and also other buildings, with certain hydraulic privileges, and two tracts of land containing together 164 acres. The payment of the $10,000 was provided for as follows: Brackney, on his part agreed to purchase a judgment of about $3,650, rendered in favor of the Catskill Bank, against Robert L. More & Co. and others, which he was to hold until the vendors should execute to him a good and sufficient warranty deed of the property contracted to be sold, at which time the judgment was to be cancelled and the balance of the sum of $4000, after deducting the amount of the judgment, was to be paid in cash, which it was stated should apply as the first payment on the purchase. The balance of $6,000 with interest from the date of the contract, to be secured by *bond* and *mortgage* on the premises agreed to be sold, and to be paid in four instalments of $1,500 each, the first to be paid on the 1st December, 1837, and the others at intervals of six months. No interest to be charged by Brackney on the Catskill judgment after the date of the contract, " provided said parties of the first part execute said deed as aforesaid." Brackney further agreed to effect an insurance for the benefit of the vendors, to the amount of $3,500, on the tannery and other buildings, and to continue the same until the payment of the bond and mortgage; and Brackney to have full possession of the bargained premises from the day of the date of the contract. On the 29th December, 1836, Brackney purchased the Catskill bank judgment, amounting to $3,764.72, and took an assignment thereof, and on the 1st day of January, 1837, paid to the vendors the difference between that sum and the sum of $4,000. In Jan-

uary, 1837, he went into possession of the bargained premises, and commenced tanning operations, and during the three next months put into the vats upwards of 4,000 hides, which he stated in his answer, would have been completed by the first of *November* following, had the premises been in order; but in consequence of their bad condition, the process of tanning was retarded and was at the putting in of the answer, on the 16th January, 1838, yet necessarily and unavoidably incomplete.  On the day the contract was entered into, but *after* it was executed, Robert L. More told Brackney that his firm had a stock of leather then going down to New-York, which would enable them to settle a certain demand of between two and three thousand dollars, and as soon as he could go down and settle it, he would execute the *deed* in a few days. On the 24th *July*, 1837, Brackney wrote a letter, addressed to Robert L. More & Co. in which he says, " I want the deed of the tannery land as per contract," and asked indulgence as to the payment of a note given them for horses until the 18th October.   This letter was delivered to *Samuel More*, who referred the bearer thereof to *Robert L. More*, on whom and on *Andrew More* he called on the 28th *July*, and told them that Brackney wanted the deed of the tannery and land at Moresville; to which application no answer intelligible to the messenger was given. In the month of *September*, Brackney employed counsel, and it was ascertained that the property was heavily encumbered by a mortgage and judgments created or suffered by the vendors; and on the *twenty-seventh* day of that month, an agent of Brackney went to *Oneida county*, the residence of *Robert* and *Andrew* More, to demand a *deed* and tender full performance on the part of Brackney.  *Andrew* was told, (Robert not being at home,) of the encumbrances, to which he answered that he had but little knowledge of the business; that Robert knew all about it.   He intimated however, that whatever incumbrances existed would be cleared off in *six or eight weeks*.   Performance

on the part of Brackney was *tendered* and *a deed demand-*
*ed.*   Andrew said he was willing to execute a deed, but
presumed it would not be accepted under existing circum-
stances, referring to the incumbrances, to which suggestion
the agent assented.   A similar interview was had with
*Samuel More,* at his residence at *Catskill,* resulting sub-
stantially in the same way.   Robert was not seen.   On
the *second day of October,* Brackney wrote to the vendors
rescinding the contract, claiming damages for the non-ful-
fillment on their part, and informing them they could have
*immediate possession* of the property, as he should do no-
thing further with it, than to take out the leather put in
by him, as soon as practicable.   On the *twelfth day of
October,* the vendors (having in the mean time removed
all incumbrances from the property,) tendered a deed exe-
cuted in due form to Brackney, who refused to receive it,
saying it came too late.   The plaintiffs thereupon on the
sixth day of *November* filed their bill, and in it stated that
Brackney had transferred the judgment of the Catskill
Bank to one *Smedberg* who had issued an execution up-
on it, and therefore prayed for an injunction as well as for
a decree for specific performance.   The defendant proved
that the tannery and the conduit in which the water was
brought to it were greatly out of repair when he took
possession; that he made partial repairs; that to put the
works in such order as to justify a prudent man to lay
down new hides in the vats in the autumn of the year,
would require an expense of at least $1000, and that the
proper time to commence a fall stock is about the first day
of October.   He stated in his answer, that the hides put
in the vats in the spring of 1837, would have been com-
pleted by the first of November following, had the premi-
ses been in order; but in consequence of their bad condi-
tion the process of tanning was retarded, and at the time
of the putting in of his answer, (16th January, 1838,)
the tanning was unavoidably incomplete.   The stock put
in the vats in 1837, was not finished in working out until

April, 1838, but a witness testified that it was worked out as expeditiously as it could be done, in the state of the premises.

The case was heard on the pleadings and proofs by the Vice-Chancellor of the fourth circuit, who dismissed the bill with costs. The following opinion was delivered by the Vice-Chancellor:

" I. The first and most important question that arises in this case is, whether time is an essential part of the agreement, or in other words, whether there has been such delay on the part of the vendor as to entitle the vendee to abandon the agreement.

There being no time specified for the performance of the agreement, each party must be required to perform what appertains to him in a *reasonable* time. A reasonable time is such a period as would be required by persons of ordinary business talents to accomplish the duties which the respective parties had to perform. Thus, a few days only would be sufficient to enable the vendee to purchase the judgment of the Catskill Bank. As there is no evidence that at the time of the contract the vendee had *notice* of incumbrances on the place, except the judgment, the vendors would be entitled to sufficient time to prepare an abstract of their title and to have the conveyance prepared. They are presumed to know the incumbrances against themselves, and were bound to discharge them immediately. If they wished a longer time for this purpose than the law allows in this case, they should have provided for it in the contract. Having made provision for the judgment in the contract, and not for the other liens, they must be understood as assuming to remove them without delay. Perhaps a few weeks would not be unreasonable, as it might be expected by the vendee that the requisite certificates from the clerks in whose offices liens might exist, should be procured, before the consummation of the bargain. Sufficient time to make the usual searches,

therefore, is all that either party under this contract could require. Allowing for the irregularities of the mail and prior engagements of public officers, which might delay a communication of the requisite information, a month, it seems to me, would be sufficient not only for this purpose, but to pay off and discharge all the demands which existed against the premises.

II. Such being the meaning of a *reasonable time*, in reference to this contract, the question arises whether the defendant Brackney has done any act on his part to occasion the delay, or to excuse it. It is not pretended that he occasioned it; but it is insisted he has excused it, or recognized his liability to complete the contract at a much later period. This is a question which must be settled by the evidence. The entering into possession by the defendant, is no excuse for the plaintiffs' delay, because it was contemplated by the article that he should so enter; continuing at work during the winter, and putting in hides in the winter and spring, were no waiver, as these were acts contemplated by the parties, and the defendant was not obliged to remain idle. Writing a letter to the plaintiff in July, asking indulgence on his note, was no waiver of the delay which occurred subsequently. He insisted in the same letter, on a deed, as per contract. Had the complainant *then* performed the agreement, no question could have arisen as to the nature of that act. The complainant not having acted upon that notice, cannot urge it now, as excusing all prior delay. The subsequent demand by Mr. Jordan cannot, for the same reason, be viewed as waiving the antecedent negligence of the complainants; they did not apprise him, that they would within a reasonable time, fulfil their part of the agreement. They are not, therefore, in a condition to say that the defendant has admitted that a performance on the last of September would have been a compliance with the contract. It proves only that the defendants preferred a performance *then* to a legal controversy. He complained of the complainant's delay at

both times: and it would be doing violence to language, as well as good sense, to construe the defendant's importunity for justice into an excuse for a wrong.

The defendant, then, has done no act excusing the plaintiff's delay; and it appears by the answer and the proof that he performed his part of the agreement in due time.

III. The plaintiffs, on the 12th of October, 1837, were ready to fulfil, the defendant having previously abandoned the contract. To determine whether the delay of the plaintiffs was so unreasonable as to justify the defendant in abandoning, it is necessary further to consider what is meant by time being of the essence of the contract. In cases where money is the main inducement of the contract, and where compensation can be readily made, time is disregarded. Such is the case with mortgages and the like. At law the mortgagee is under no obligation to re-convey unless paid at the time. Yet in equity a re-conveyance will be ordered, though the money is not paid at the time stipulated, if paid with interest at the time a re-conveyance is demanded. Although no re-conveyance takes place with us in mortgage cases, the principle, nevertheless, is applicable here as well as in England. The mortgagee is never too late to redeem. The doctrine, too, of releasing against penalties, is founded on the same principle of compensation.

But where compensation cannot be made, and the damage is not susceptible of exact calculation, and where the defendant has done no act to waive it, time is an essential element of the contract, even in this court. There is a settled distinction, also, between the case of a vendor coming into this court to compel a vendee to performance, and of a vendee resorting to equity to compel a vendor to perform. This distinction is noticed by Judge Spencer in delivering his judgment in the court of errors, in *Waters* v. *Travis,* 9 *Johns. R.* 465. A greater indulgence is shown to a vendee who is a complainant seeking to complete his purchase, than to a vendor under like circumstances. A

1841.

Smedberg
v.
More.

vendor who demands the execution of an agreement, ought to show that there has been no default in him in performing all that was to be done on his part. If he has shewn a *backwardness* in performing his part of the contract, equity will not decree a specific performance in his favor. See *Fonb. Tr. Eq., Book* 1, *ch.* vi, § 2, *last ed. p.* 282 *and notes, p.* 45, *&c.* So, in *Guest* v. *Hornfray,* 5 *Ves.* 818, specific performance was refused to a vendor on account of his laches in performing his part of the agreement. This case is cited by the plaintiffs' counsel to show, that under certain circumstances a year's delay would not be unreasonable. But although the defendant entered into possession at the time of the contract, and it appeared he was an unwilling purchaser, three months' delay was held too long, and the bill was dismissed. The case is an authority to show that time is an essential consideration in these cases, and that the question, whether the delay is reasonable or not, must depend on the facts of each case and be decided by the court.

The materiality of time in a sale of real estate was fully considered by Chancellor Kent, in *Benedict·*v. *Lynch,* 1 *Johns. Ch. R.* 370, in a bill by the vendee against the vendor. In that case the plaintiff went into possession and built a house on the farm, but made no payment. The contract contained a clause that in case the vendee failed in any of the payments, the agreement should be void. The plaintiff filed his bill before all the payments were due, and tendered the whole money with interest. Although, in this case, compensation could be made the vendor by the payment of the entire consideration money with interest, and this tender was made before the expiration of the time fixed by the parties for the last payment, the chancellor dismissed the bill. He held that the vendor had a right to insist on the payments *at the times* when they were respectively stipulated to be paid; and on a review of a great number of the cases, he comes to the general conclusion that time is a circumstance of decisive import-

1841.

Smedberg
v.
More.

ance in these contracts, but it may be waived by the conduct of the parties; that it is incumbent on the plaintiff calling for a specific performance, to show that he has used *due diligence*; or, if not, that his negligence arose from some just cause, or has been acquiesced in; that it is not necessary for the party resisting the performance, to show any particular injury or. inconvenience; it is sufficient if he has not acquiesced in the negligence of the plaintiff, but considered it as releasing him.

It is obvious from the nature of things, that no precise period can be fixed by the courts, beyond which delay shall be deemed so unreasonable as to deprive the party of the interposition of the court. Each case must depend on its own circumstances. If the complainant is *in default* for a day, and the defendant has acted upon such default and abandoned the contract, it is as effectual as if he had wasted a month or a year. There must be a time beyond which the vendee is not bound to wait. His defence is complete, when that time has arrived, and gains no accession of strength by efflux of time. It is perfect at once, and admits of no degrees of comparison. There is no state of dubious uncertainty, except so far as our . faculties are unable to decide. The complainant is either guilty of neglect or he is not. The law recognises no middle state or condition—no intermediate region in which the party rests for days or weeks in passing from vigilant activity to palpable neglect.

There are reasons in the present case why diligence should be exacted of the vendor. The purchase was of a tannery requiring extensive and costly repairs. The season for making those repairs was proved to be the latter part of the summer, and unless then made would subject the party to increased hazard and expense, and perhaps involve the loss of an entire season. The expenses of these repairs were shown to be about one-tenth the sum contracted to be paid for the entire property. It was unreasonable to require the defendant to incur that expense

before he received a perfect title.    Again, the complain-
ants show no excuse for their delay.    They met with no
casualty or misfortune, nor were they misled by the de-
fendant.    Their delay, as far as can be discovered, was for
their own convenience.

Although it was unnecessary for the defence, it still ap-
pears satisfactory that the delay was to the prejudice and
inconvenience of the defendant.    His property, whilst in
that situation, could neither be repaired or sold.    It was
effectually excluded from the market, had he wished to
make a sale.

The rule which withholds the aid of this court from a
party who has been guilty of negligence in performing his
own part of the agreement, is founded in the soundest
principles of policy and justice.    Its tendency is to uphold
good faith and punctuality in dealing.    The notion that
sometimes seems to prevail, that a party may disregard his
own part of a contract, and obtain relief in equity from
the penalty of his gross negligence, is injurious to good
morals, to a lively sense of obligation, to the sanctity of
contracts, and to the character of the court, *per Kent,* 1
*Johns. C. R.* 376.    The maxim, *vigilantibus non dormienti-
bus, leges subveniunt,* is not without good sense in its gene-
ral bearing; but it has peculiar force and pertinency in a case
like the present.    In a country where the value of real es-
tate is not fixed, as in England, but is constantly fluctuat-
ing, and where competition, and enterprise, and specula-
tion are constantly changing the relative importance of
different kinds of business, as well as the relative value of
property, parties ought not to be permitted to lie by and
speculate on their own contracts, fulfilling them if advan-
tageous, or disregarding them if their interest seems to
lead in that direction.    At any rate, this court should not
be a party to such speculation.

Having arrived at the conclusion that time was a mate-
rial ingredient in this contract, that the plaintiff had a rea-
sonable time within which to perform on his part, that he

1841.

Smedberg
*v.*
More.

was guilty of an unreasonable delay in giving to the defendant an unincumbered title to the property, that this delay has not been occasioned by the acts of the defendant or waived, or excused by him, that the defendant had a right to abandon the contract at the time he did abandon it, it becomes unnecessary to examine the other points raised by the defendants' counsel. The one on which I choose to rest my decision, embraces the merits of the case, and cannot be obviated by any proof which may still be presumed to remain.

The parties must be left to their rights and remedies at law, if they have any. I wish to decide the case without prejudice to any ulterior steps. It is probably better to have what remains undisposed of in the case, settled in an action at law, on the agreement, than to retain the bill for that purpose. Bill dismissed with costs.

The following was appended as a *note* to the opinion of the Vice-Chancellor:

After writing the foregoing opinion, I examined Judge Cowen's note to Phillips' Evidence, which treats of specific performance. *See No.* 27 *to note* 307, *pages* 342 *to* 346 *of notes.* All the cases, both in England and in this country, are there collected. The note is on that branch of the subject which relates to *time* of performance. Perhaps some hundred of cases are collected. I have read only a few of them. The Judge, however, concludes by observing, *page* 345, that " inexcusable delay is a circumstance against a specific execution; though how soon mere naked laches will foreclose a party, has not been held." He then mentions a variety of circumstances which more or less influence the decision of courts on this branch of the subject, from which he concludes that " no general rules can be gathered as to delay in the abstract," and that " this is one of those subjects which rests in a very large discretion." A review of the note, rather *confirms* my opinion in the principal case, than otherwise.

The decree of the Vice-Chancellor was reversed by the Chancellor who made a decree for a specific performance, and that Smedberg acknowledge satisfaction of the judgment of the Catskill Bank, and that the amount thereof be applied towards satisfaction of the purchase money. See the opinion delivered by the Chancellor, 8 *Paige* 604, *et seq.*

From this latter decree, *Smedberg* and certain individuals the representatives of *Brackney,* who had died, appealed to this court, where the case was argued by

*A. L. Jordan* for the appellants.

*S. Stevens* for the respondents.

When this case was called up for decision,

Mr. *Justice* Bronson read an opinion, (a copy of which has not been furnished the reporter,) substantially as follows: He remarked that there was nothing to indicate that *time* was deemed by the parties *important*, in reference to the execution of the contract; it could not even be said that performance could be required within a *reasonable time* as usually understood, for that might mean only *twenty-four hours* or *one week.* Brackney undoubtedly was entitled to a reasonable time to purchase the judgment held by the Catskill Bank; and *until* the purchase was made, the vendors were chargeable with interest upon the amount thereof. He took an assignment of the judgment within fourteen days, and in that respect could not be deemed chargeable with laches. So on the other hand, the tender of a deed by the vendors within *twelve days* after demand, should in his judgment, be deemed a sufficient performance on their part, under a contract so loosely drawn as the present, to entitle them to sustain their bill. He said he spoke of the demand for a deed made in *September,* for he did not deem the letter of

1841.

Smedberg
*v.*
More.

the 24th of *July* sufficiently definite to apprise the vendors that a *formal demand* was intended. The demand in the letter was mixed up with other matters, such as desiring indulgence in the payment of a note. Brackney himself did not consider the letter a sufficient demand, or why make the second demand. It is claimed on the part of the defendants that Brackney had a right to repudiate the contract on the ground of the necessity which existed for making repairs, and the consequent importance of having a deed before incurring the heavy expenditures which would be necessary; but Brackney knew of this necessity when he entered into the contract, and yet left the *time* indefinite for the execution of the deed. There is no pretence, (he also said,) that the existence of the incumbrances was a cause of objection on the part of Brackney, to the completion of the contract; the incumbrances were sought up and brought forward at the time of the demand for the deed, but when the deed was tendered to him, Brackney did not put his refusal to accept it upon the existence of the incumbrances, but that the time for a tender was past. Besides, the existence of the incumbrances is not even alleged in the answer. Again: Brackney entered into possession of the premises shortly after the contract was made, and continued in possession several months after he repudiated it. If he intended to break the contract and consider it at an end, he should have withdrawn his property. Finally, the judge concluded by expressing his hopes, that our courts would not follow the English cases in the great strictness held by them on the subject of *time* in the performance of contracts. With these views of the case, he said he was of opinion that the decree of the Chancellor ought to be affirmed.

*Senator* LEE adverted to the testimony of John W. Brackney, a witness examined on the part of the defendants, who testified that the purchaser in a conversation with one of the vendors, expressed his willingness to pay the ba-

lance of the first payment of $4000, which should remain after taking up the judgment of the Catskill Bank, on receiving the deed. This showed at least that the purchaser expected to receive the deed on making that payment. He was of opinion that the decree of the Chancellor should be reversed. The purchaser could not make the necessary repairs without endangering the loss of a very considerable sum of money; and besides the *demand* of a deed in *July* was amply sufficient.

*Senator* FURMAN said he also was for a reversal of the decree of the Chancellor. The vendors were entitled only to *reasonable time* to remove the incumbrances and execute the deed. No steps were taken by them to remove the incumbrances until after they had been informed by the purchaser that he had abandoned the contract; and twice did they neglect to give the deed, although formally demanded. If, under such circumstances, the vendors be held to have duly performed the contract on their part, the advantage is all on their side. When no time is specified in a contract, *reasonable time* is the rule. But here the demand for the deed, at all events, was made on the 27th *September*, which was followed by a notice of rescindment, and no deed was tendered until *twelve days* afterwards.

*Senator* VERPLANCK said he agreed in opinion with *Senators* LEE and FURMAN, and expressed his general concurrence in the views of the law of the case as presented in the opinion delivered by the VICE-CHANCELLOR. Indeed, he thought the CHANCELLOR, in the main, did not differ much from the Vice-Chancellor; and that the probable reason of the Chancellor's judgment was a misapprehension of the purport of the letter of the 24th July. The Chancellor assumes that the purchaser had asked for an extension of time for the payment of the balance of the first instalment. There is no evidence in respect to an extension of time, except the letter of the 24th *July*, and

1841.

Smedberg
v.
More.

that relates to the payment of a note given on the purchase of *horses*.

*Senator* Dickinson said that he was also for a reversal. It had, however, been said that the purchaser was not entitled to be relieved from the contract, because he had not yielded unqualified possession of the property. But he would ask how could that be? The hides were in the vats, and could not be removed without endangering the loss of the property. As well might a farmer, who had put crops in the ground, be required to remove them before harvest.

The Chancellor observed, that in forming his judgment in the case, he had not proceeded upon the mistake, which it had been supposed he had made in misapprehending the letter of 24th July. It is the rule (said the Chancellor) that unless by the terms of the agreement, the *time* of making the title was made an essential part of the agreement, equity will assist the vendor, who has not been guilty of gross negligence, although the deed be not tendered until after a demand made.

*Senator* Hull said, that here was evidently culpable negligence on the part of the vendors, and he therefore would vote for a reversal.

Mr. *Justice* Bronson enforced his view of the case. He repeated, that no day was specified in the contract when the deed was to be executed, and it was evident that the parties did not contract even in reference to the principle of *reasonable time*. Brackney was to purchase the judgment of the Catskill Bank, and no interest was to be charged after the date of the contract; but yet there was no provision as to time. He would venture to say, that no adjudged case could be found in which a contract was refused to be enforced, where the purchaser had entered into possession of the bargained premises, and remained in

possession at the filing of the bill for a specific perform-
ance.

*Senator* ROOT remarked, that he had not been able to
discover that the purchaser had sustained any injury.   He
knew of the existence of the judgments; a specific arrange-
ment was made as to the judgment of the Catskill Bank,
and as to another judgment held in New-York.   The de-
mand for a deed in *July* was made of a younger brother;
the object of the letter of that date was to obtain an exten-
sion of payment of another contract, and no intimation was
given that the contract would be rescinded if the deed was
not delivered.   The change in the money market was
most probably the cause of the rescindment.   Besides the
demand in *September* waived the demand in *July*, and af-
ter the second demand, it cannot be said but that the per-
formance was in *reasonable time;* from the period of the
second demand only should the time be counted.   The
purchaser had obtained possession of the tannery, which
probably was all that was valuable, and he might have
gone on and made repairs with safety, as there is no
pretence now of any existing judgment other than that
of the Catskill Bank, and the judgment held in New-
York.   He would therefore vote for an affirmance of the
decree.

*Senator* NICHOLAS observed that he had come to the con-
clusion that the decree should be reversed.   In his opinion,
there had been unwarrantable delay on the part of the ven-
dors.   When no time is specified in a contract for per-
formance, the question is, whether *time* is of the essence
of the contract, and to determine that question, depends
upon the fact whether the rights of the parties are affected
by time.   When the purchaser in this case went into pos-
session, the bargained premises were in a very dilapidated
state, requiring to be restored to their original condition to
enable the holder to enjoy them advantageously.   No pru-

1841.

Smedberg
v.
More.

dent man, under such circumstances, would incur any considerable expense in repairs until he had obtained a deed of the property. Besides: there were heavy incumbrances, of which the purchaser had no knowledge at the time of the contract. He also was of the impression, that the error of the Chancellor had originated in a misapprehension of the purport of the letter of 24th July. Although generally averse to interfering with contracts, he felt it his duty here to do so, as he considered the vendors grossly in default.

Mr. *Justice* BRONSON again rose, and adverted to the testimony of the witness Brackney, to show, that at the time of the contract, incumbrances were known by the purchaser to exist, viz: the judgment of the Catskill Bank, and the judgment held in New-York; and then proceeded to observe, that there could be no pretext that the purchaser repudiated the contract on account of the existing incumbrances. At all events, he said, the demand of a deed in *September* waived the previous demand, and the tender of a deed by the vendors within *twelve days* thereafter, was sufficient to entitle them to a decree for a specific performance.

On the question being put, *Shall this decree be reversed?* the members of the court divided as follows:

*In the affirmative:* The PRESIDENT of the Senate, and *Senators* DICKINSON, FURMAN, HOPKINS, HULL, HUMPHREY, HUNT, LEE, NICHOLAS, PLATT, VERPLANCK, and WORKS —12.

*In the negative:* Mr. *Justice* BRONSON, and *Senators* CLARK, ELY, HAWKINS, HUNTER, H. A. LIVINGSTON, PAIGE, PECK, RHOADES, ROOT, SCOTT, and STRONG—12.

Whereupon the decree of the Chancellor was *pro forma* AFFIRMED.