Mr. Justice Clieeoed
delivered the opinion of the court:
Discretionary authority was vested in the Secretary of the Treasury to appoint special agents to receive and collect abandoned or captured property in any State or Territory designated as in insurrection by the proclamation of the President issued for that purpose, subject to the condition that the power “ shall not include property which has been used or intended to be used” to aid the rebellion. (12 Stat. L., 820.)
*17 Pursuant to that provision the petitioners, as they allege, entered into a contract with an assistant special agent that they should proceed to La Fayette County, in the State of Arkansas, and there procure evidence sufficient to establish the right of the United States to certain lots of cotton there situate, and put the same in shipping order and transport the cotton to Camden, in that State, there-to be delivered to the said assistant special agent. In consideration whereof it was then and there stipulated in behalf of the United States, as-the petitioners allege, that they should have and be entitled to one-half interest in all such cotton so procured when the same should be condemned; that in all such cases where the cotton • should be released by competent authority subsequent to the seizure, the stipulation was that they should be paid for all expenses in procuring evidence to warrant the seizure, in putting the cotton in order for shipping, and in transporting the same to the place of delivery; and they aver that 'they proceeded to the place named, that-they procured evidence to warrant the seizure of four hundred and fifty-one bales of cotton, and that they put the same in order for shipping and transported the same to the place of delivery named in the contract.
Condemuation did not follow the seizure, but the petitioners aver that the cotton was subsequently released by competent authority and delivered over to the former owners, and that they expended $17,356 in procuring evidence to warrant the seizure of the same, in putting it in order for shipping, and in transporting it to the place named in the contract.
Seasonable appearance was entered by the Attorney-General, and he filed an answer in due form in which he denied each and every allegation of the petition, and alleged that the United States are not indebted to the petitioners in the sum claimed, or any part thereof. He also set up the following special defenses: (1) That the petitioners have not always borne true faith and allegiance to the United States; (2) That they did not file their petition and transmit the same to the court within six years from the time the claim accrued.
Sufficient appears to show that the two lots of cotton mentioned in the petition, amounting to four hundred and fifty-one bales, were collected by the petitioners as abandoned or captured property; that expenses to the amount'claimed were *18 incurred by them in transporting, rebaling, and ginning tlie same, under the alleged contract, the terms of which correspond with those set forth in the petition; and that the same was subsequently released by the military officer commanding in that district before the cotton was condemned, as shown by the finding of the court.
Assistant special agents had no power to make such a contract, and the record fails to show that the contract under which the petitioners claim to have acted was ever approved by the supervising special agent. Express power to make such rules and regulations as were necessary to carry out the provisions of the act enacted for that purpose was, by the eleventh section of the Act July 2,1864, (13 Stat. L., 378,) vested in the Secretary of the Treasury, with the approval of the President.
Regulations to effect the object were ordained by the Secretary under the prior act, the twelfth article of which provided that “ supervising special agents may contract in behalf of the United States for the collection and delivery to them of such property in their respective agencies on the best possible terms, not exceeding 25 per cent, of the proceeds of the property,” the condition being that such “ percentage must be in full compensation for all expenses, of whatever character, incurred in collecting, preparing, and delivering such property at the points designated.” Prior to any such contract being made the party proposing must submit in writing a statement of the kind and amount of property proposed to be collected, the locality whence to be obtained, and all the facts and circumstances connected with it.
Contracts of the kind were required to be in writing, and to be restricted to the'collection of particular lots at named localities, except in special cases, ¿where it might extend to the general collection and delivery of all abandoned property in limited districts, not greater than'one parish or county. Supervising special agents could recommend an allowance greater than 25 per cent, of the proceeds, but no greater allowance could be made until it was approved by the Secretary of the Treasury. '
Article thirteen of the same regulations provided, “nor shall any liability be incurred, or assumed, or contract be made, on the part of the United States, by such agents, except as authorized by these regulations.” New. regulations were issued on the *19 29th of July, 1864, by which those previously promulgated were superseded, and it was the regulations last named which were in force at the time the contract in this case was executed.
Such contracts for the collection and delivery of abandoned or captured property might still be made by the supervising special agents, when the property was liable to be lost or destroyed in consequence of its location -being unknown to the special agents, or from other causes. Parties under such circumstances might propose, for compensation, to collect and deliver it into the hands of such agents, at points designated by them, and the supervising special agents might contract in be-' half of the United States for the collection and delivery to them of such property in their respective agencies on the best possible terms, not exceeding 25 per cent, of the proceeds of the property, the condition being, as in the prior regulations, that the percentage allowed must be in full compensation for all expenses, of whatever character, incurred in collecting, preparing, and delivering such property at the points designated.
Three other conditions are also annexed to the exercise of the power therein granted, as follows : (1) That the party proposing, prior to any such contract being made, must submit, in writing, a statement of the kind and amount of property proposed to be collected, the locality whence to be obtained, and all the facts and circumstances connected with it, particularly as to its ownership. (2) That any contract made in pursuance of the regulation must be in writing and must be restricted to the collection and delivery of particular lots at named localities, except in special cases, where the contract may extend to the general collection and delivery of all abandoned property, in limited districts, as provided in the twelfth article of the prior regulations. (3) That the contractor, before payment to him under the contract, shall execute a bond with penalty, equal to the amount stipulated to be paid to him, and with sureties satisfactory to the supervising special ageut, indemnifying the United States against all claims to the property delivered, on account of damages by trespass or otherwise, occasioned by the act or connivance of the contractor, or on account of expenses incurred in the collection, preparation, or transportation of the property.
Payment by the supervising special agent of any greater percentage than one-quarter of the proceeds is also forbidden by *20 these regulations, even though he was of the opinion that the case was one which would justify it. All he could do in such a case was to state the facts and circumstances, and refer the same to the Secretary for instructions.
Nothing can be plainer in legal decision than that the assistant special agent in this case derived no authority under the Treasury regulations to make the contract set forth in the petition, and it is equally clear that the record furnishes no other evidence to justify the conclusion that the-supervising special agent ever approved it than what is contained in the indorsement thereon, which reads as follows: “ Subject to the approval of the Secretary of the Treasury, the within contract is approved, so far as it conforms to the regulations of the Treasury Department, for paying one-fourth of the cotton condemned; and it is recommended that one-half of said cotton be allowedto which is appended the name of the supervising special agent.
Hearing was had, and the court dismissed the petition for the following reasons: (1) That the contract, not having been approved by the supervising special agent, was incomplete, and no benefit having resulted to the Government from its alleged fulfillment, there is no legal or equitable ground for recovery. (2) That if the contract was valid, the loss to the claimant was caused by the illegal seizure subsequently made, and for that the Government is not liable.
Due application by the petitioners was made for an appeal, and the same was promptly allowed by the court.
Three errors are assigned by the appellants, as follows : (1) That the court erred in deciding that the United States are not bound by the contract given in evidence. (2) That the court erred in holding that the petitioners could not recover the expenses incurred by them in securing.and transporting the cotton. (3) That the court erred in holding that the United States were discharged or relieved of liability by the subsequent illegal and arbitrary acts of their own military officer.
Much aid will be derived from dates in determining the question whether the contract given in evidence was made by competent authority, it being apparent that neither the act of Congress nor the Treasury regulations vested any such power in the assistant special agents. Public employés called supervising special agents could make contracts for the, collection -of abandoned and captured property, and if it be conceded that *21 they could also ratify such contracts as were made by assistant special agents, which is not admitted, it becomes highly important to examine with care' the indorsement on the contract given in evidence in this case by the petitioners.
Enough has already appeared to show that the terms of the contract referred to were such that it would have been illegal, even if it had been executed by the supervising special agent, inasmuch as it promised one-half interest to the party employed to perform the service in collecting, preparing, and transporting the cotton to the place of storage..
Suppose supervising special agents could ratify contracts made by assistant special agents, • it must nevertheless be understood that their power in that behalf was restricted to the ratification of such contracts as they themselves were empowered to mate. Even suppose “they could ratify a contract made by an assistant special agent allowing the party one-quarter interest in the property collected and condemned, it would by no means follow that they could ratify a contract allowing to such party one-half interest in the property for performing the same service, as it is clear that the supervising special agents themselves were never authorized to make such a contract. They could contract to allow one-quarter interest in the property and no more. If a case arose which, in the opinion of the supervising special agent, would justify the payment of a larger percentage, he might make a statement of the facts and circumstances and give his reasons for the opinion, but all he could do.beyond that was to refer the case to the Secretary for instructions.
Coupled with that incurable difficulty are certain other obvious defects in the certificate, which clearly render it insufficient and inoperative as an instrument of ratification. Of these, the first is that it was not signed by the supervising special agent until March 28,1866, more than four months and a half after the contract between the assistant special agent and the petitioners was executed.
Responsive to that, it is suggested that a subsequent ratification is as good as a previous authority, but the decisive answer to that suggestion is that all the services for which compensation is claimed were performed more than three months before the indorsement in question was made by the supervising special agent. His indorsement bears, date as *22 ¡aforesaid, and the finding of the courtshows thatthe services for which compensation is claimed were all performed before the •close of the preceding year.
Properly construed, the' indorsement is nothing more than a reference of the whole subject to the Secretary of the Treasury for his decision, and it is not pretended that the contract was ever in any respect or to any extent approved or ratified by the Secretary. Even when regarded as a mere recommendation, it should be observed that the indorsement does not in any sense extend to the whole contract under which the services were performed. Instead of that, it is expressly restricted to such portions of it as conform to the regulations of the Department for paying one-fourth of the cotton condemned. What is said about allowing one-half of the cotton, it is conceded, is only a recommendation, and it must be admitted that it does not comply with the conditions of the regulations, which require that the supervising special agent shall in such a case make a statement of the facts and circumstances, and give the reasons which in his opinion justify such additional allowance.
Viewed in any light, it is clear that the case of the petitioners falls within the prohibition contained in the thirteenth article of the regulations, which reads as follows : “ Nor shall any liability be incurred or assumed or contract be made on the part of the United States by such agents, except as authorized by these regulations.” Changes were subsequently made in the regulations, the sixth article of which forbids supervising special agents to collect such cotton directly or to make contracts for collecting it; but it is unnecessary to enter into those details, as the contract in this case was made during the period the prior regulations were in full force and operation.
Tested by these several considerations, it is obvious that the conclusion of the court below that the contract was incomplete because not approved by the supervising special agent is correct. Beyond all doubt it was made by the assistant special agent, who had no authority to make it, and it appearing that it never was approved by the supervising special agent, it follows that it was null and void.
Two minds are required to make a contract or to change its terms and conditions after it is executed, and, if so, it is clear that the supervising special agent could, not alter or vary the terms and conditions of the contract in this case without the *23 consent of tbe petitioners, nor could any change be made in the contract, so as to hind the United States, unless it was in writing, as the twelfth article provides that any contract made in pursuance of the regulations must be in writing and be restricted to the collection of particular lots at, named localities. Alterations, not in writing, even if made by the consent of the parties, would be null and void, because the authority to make such without reducing the same to writing is not conferred by the regulations.
Apply that rule to the case and it follows beyond all question that the supervising special agent never did approve the contract exhibited in the record. By the terms of the contract as exhibited the petitioners were to have one-half interest in the cotton procured and condemned, but the indorsement which is invoked as an approval of it by the supervising special agent professes to reduce the allowance to one-fourth of the cotton condemned, and the record discloses no evidence whatever that the petitioners ever assented to any such alteration. On the contrary, the clear inference from the petition is that they repudiate the suggested modification, as they therein allege that they are entitled to one-half interest in all such cotton so collected for and on behalf of the United States.
No attempt was made by the supervising special agent to approve the contract made by the assistant special agent, except so far as it conformed to the Treasury regulations, and, inasmuch as it did not conform to those regulations in respect to the compensation to be paid or allowed to the petitioners, it necessarily follows that the contract was made without authority, and that it is inoperative and void.
Argument to show that no benefit ever resulted to the United States from the alleged fulfillment of the contract is quite unnecessary, as the finding of the court below establishes the fact that the cotton was restored to the former owner, and that it never was condemned. Services rendered under a contract executed by an unauthorized agent and never approved or ratified by any competent authority create no equity, unless it appears that the services performed resulted in some benefit to the party for whom they were rendered.
Admit that, and still it is insisted by the petitioners that they are entitled to the compensation-claimed, because the cotton was restored to the former owner. They were to be allowed, by the *24 terms of the contract, one-half of the cotton so recovered and condemned,” but none was condemned, so that they cannot claim anything under that stipulation, even if the contract is operative and binding.
Without assenting to that proposition they next contend that they are at least entitled to the expenses under the succeeding clause in the contract, which, provides that “ in all cases where the cotton is released after seizure, upon sufficient evidence to warrant the same, the petitioners will be repaid all expenses in performing the stipulated service.”
Two facts must concur, even if the contract is operative, to entitle the petitioners to recover expenses: (1) That the cotton was released by the United States. (2) That the seizure was made upon sufficient evidence to warrant the same.
Neither is proved, and the first proposition is substantially, negatived by the finding of the court below. Particular description is given of the several lots of cotton, and the finding of the court is to the effect that two of the lots of cotton, amounting to four hundred and fifty-one bales, were forcibly taken out of the warehouse where they were deposited, by the military officer commanding in the district, and were restored to the former owner. Evidence to show that the officer acted in behalf of the United States is entirely wanting, and the case proceeded here throughout the trial upon the ground that the acts of the officer in restoring the cotton were unauthorized and unlawful, nor was any evidence introduced to show under what circumstances the cotton was seized, whether with or without sufficient evidence to justify the seizure within the meaning of the contract.
Different rules prevail in respect, to the acts and declarations of public agents from those which ordinarily govern in the case of mere private agents. Principals, in the latter category, are in many cases bound by the acts and declarations of their agents, even where the act or declaration was done or made without any authority, if it appear that the act was done or declaration was made by the agent in the course of his regular employment; but the Government or public authority is not bound in such a case unless it manifestly appears that the agent was acting within the scope of his authority, or that he had been held out as having authority to do the act, or was employed in hjs capacity as a public agent to do the act or, make the declar *25 ation for the Government. (Story’s Agency, 6th ed., sec. 307, a; Lee v. Munroe, 7 Cran., 376.)
Although a private agent, acting in violation of specific instructions, yet within the scope of his general authority, may bind his principal, the rule as to the effect of the like act of a public agent is otherwise, for the reason that it is better that an individual should occasionally suffer from the mistakes of public officers or agents than to adopt a rule which, through improper combinations or collusion, might be turned to the detriment and injury of the public. (Mayor v. Eschback, 17 Md.; 282.)
Individuals as well as courts must take notice of the extent of authority conferred by law upon a person acting in an official capacity, and the rule applies in such a case that ignorance of the law‘furnishes no excuse for any mistake or wrongful act. (State v. Hayes, 52 Missouri; Delafield v. State, 26 Wend., 238; People v. Bank, 24 Wend., 431; Mayor v. Reynolds, 20 Md., 10.)
Torts committed by an officer in the service of the United States do not render the Government liable in an implied assumpsit, even though the acts done were apparently for the public benefit. (Gibbons v. United States, 8 Wall., 274.)
Neither fact nor circumstance is found in the record tending to show that the officer who took the cotton from the warehouse where it was stored and returned it to the former owner possessed any authority to interfere in the matter, and it is clear that if the cotton was abandoned or captured property, within the meaning of the act of Congress under which it was collected, transported, and stored, the acts of the officer were unauthorized and unlawful. Proof to support his authority not being found in the record, it cannot be presumed in this case, and consequently it does not appear that the cotton was released after seizure by the United States.
Suffice it to say that, in the opinion of the court, the case shows no legal or equitable ground of recovery.
Decree affirmed.