## GRAHAM et al. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. June 19, 1911.)

### No. 1,014.

1. TRIAL (§ 110*)—PRESENTATION OF EVIDENCE.

In an action by the United States on the bond of a contractor on which a surety company was surety, the admission in evidence of letters written by the surety company was not subject to any just objection because they were written on letter heads of its own showing that its capital was over $1,000,000.

[Ed. Note.—For other cases, see Trial, Dec. Dig. § 110.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. SALES (§ 83*)—CONSTRUCTION OF CONTRACT—GOODS BOUGHT F. O. B. CARS—
DUTY TO FURNISH CARS.

It is the general rule, in the absence of agreement or a practice to the
contrary, that, where goods are bought f. o. b. cars, the obligation is upon
the buyer to furnish the cars necessary in transportation.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 224–227; Dec.
Dig. § 83.*]

3. CONTRACTS (§ 262*)—RIGHT OF RESCISSION—WAIVER OF BREACH.

The right of a defendant, who contracted to dress building stone to
be delivered to him by the other party, to rescind because of delay in
delivery of the stone, was lost, where he failed to act promptly, but re-
ceived and dressed a large part of the stone after shipments had been
resumed.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1181–1183;
Dec. Dig. § 262.*]

4. UNITED STATES (§ 72*)—CONTRACT FOR PUBLIC WORK—POWER TO ANNUL.

Act March 3, 1903, c. 1007, 32 Stat. 1102, making an appropriation for
a new building for the Smithsonian Institution, authorized the Superin-
tendent of Buildings and Grounds, Library of Congress, to make the con-
tracts for the work and disburse the money therefor.  He entered into
a contract with defendant to do certain work, which provided that on
defendant's failure to faithfully prosecute the work the superintendent or
his successor should have power, "with the sanction of the regents of
the Smithsonian Institution," to annul the contract.  The regents include
the Chief Justice and Vice President of the United States and Senators,
and meet only about three times each year, leaving all matters of detail
to the secretary.  Held, that an annulment of the contract by the Super-
intendent of Buildings and Grounds with the concurrence of the secre-
tary of the institution was legal and effective.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 55; Dec.
Dig. § 72.*]

5. UNITED STATES (§ 67*) — CONTRACTOR'S BOND — DISCHARGE OF SURETY—
CHANGE IN CONTRACT OF PRINCIPAL.

A bonding company, which for a monetary consideration becomes sure-
ty for the performance of a contract to do work for the United States,
will not be released from liability because of changes made in the con-
tract, in accordance with its provisions and with the assent of the con-
tractor, unless it is shown that it was injuriously affected by such
changes.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec.
Dig. § 67.*]

In Error to the Circuit Court of the United States for the District
of Maryland, at Baltimore.

Action at law by the United States against Frank F. Graham and
the Guaranty & Surety Company.  Judgment for plaintiff, and de-
fendants bring error.  Affirmed.

In the Sundry Civil Appropriation Act, approved March 3, 1903, c. 1007, 32
Stat. 1102, Congress enacted:

"To enable the Regents of the Smithsonian Institution to commence the
erection of a suitable fireproof building with granite fronts, for the use of the
National Museum, to be erected on the north side of the Mall, between Ninth
and Twelfth streets, Northwest, substantially in accordance with the plan A,
prepared and submitted to congress by the Secretary of the Smithsonian Insti-
tution under the provisions of the act approved June twenty-eighth, nineteen
hundred and two, two hundred and fifty thousand dollars.  Said building
complete, including heating and ventilating apparatus and elevators, shall cost
not to exceed three million five hundred thousand dollars, and a contract
or contracts for its completion is hereby authorized to be entered into subject

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to appropriations to be made by Congress. The construction shall be in charge of Bernard R. Green, Superintendent of Buildings and Grounds, Library of Congress, who shall make the contracts herein authorized and disburse all appropriations made for the work, and shall receive as full compensation for his services hereunder the sum of two thousand dollars annually in addition to his present salary, to be paid out of said appropriations."

On October 23, 1906, Frank F. Graham entered into a contract with Bernard R. Green, "acting under the direction of the Regents of the Smithsonian Institution, for and in behalf of the United States of America," whereby he (Graham) agreed to "transport from the quarry, cut, box and deliver complete, all the Bethel granite," to be furnished by Green "free on board cars at the quarry at Bethel, Vt., required for that portion of the South Pavilion above the first floor level of the said building for the National Museum in Washington, District of Columbia, described as part 'C' in the specifications, the drawings therein referred to, and the instructions and general conditions, all for the gross sum of one hundred and forty nine thousand dollars." To secure the performance of his contract Graham executed bond in the penalty of $50,000 with the Title Guaranty & Surety Company as surety. This contract, among other things, provided that, if Graham failed "to prosecute faithfully and diligently the work in accordance with the specifications and requirements of this contract, then Green or his successor legally appointed should have power with the sanction of the Regents of the Smithsonian Institution to annul this contract by giving notice in writing to that effect" to Graham. That the United States should have the right to recover whatever sums might be required to complete the contract after such annulment, in excess of Graham's contract price, and apply to such completion of the work any sums not paid over to Graham at the time for work done by him. On March 18, 1908, Green, alleging that Graham had stopped work and failed to prosecute it faithfully and diligently as the contract required, gave notice to Graham in writing of its annulment, and subsequently the work was done and completed by the government under Green's supervision at a cost in excess of Graham's contract price, after taking into account prior payments, of $56,-080.75. Thereupon the United States instituted this suit upon Graham's bond and after a protracted jury trial, on June 25, 1910, secured a verdict for $50,-000 against Graham and the surety company, upon which verdict judgment was entered by the court on June 28, 1910, for said sum of $50,000 and $280.19 costs of suit. To this judgment this writ of error has been sued out.

Charles F. Harley (George R. Gaither, John B. A. Wheltle, and Burdette B. Webster, on the brief), for plaintiffs in error.

John Philip Hill, U. S. Atty., and J. Craig McLanahan, Asst. U. S. Atty., for the United States.

Before PRITCHARD, Circuit Judge, and DAYTON and CONNOR, District Judges.

DAYTON, District Judge (after stating the facts as above). Graham filed some 14 and the surety company 15 pleas in defense of this suit. The first 14 filed by the surety company are substantially the same as those filed by Graham, and both sets could have been well reduced to 4, one the general issue, the other 3 setting forth the charges: First, that the contract was not annuled lawfully by Green; second, that Green had not performed the conditions of the contract required of him in the furnishing of the granite properly to Graham, whereby and by reason whereof he had broken the contract, and Graham was entitled to abandon it; third, that the expenditures after annulment of the contract by Green in the completion of the work were not reasonable and fair. The fifteenth plea filed specially by the surety company set forth that, without its knowledge and assent, material alterations had been made in the contract, whereby it became released

of its surety obligation. Thus analyzed it will be perceived that of these three substantial defenses, other than the general issue, set up by these defendants jointly in their multitude of pleas, the last two presented wholly questions of fact which were proper to be submitted to the jury under instructions of the court. During the course of the trial, extended over some 28 days, 39 separate bills of exception were taken, and 47 assignments of error are now here made.

[1] It could hardly be expected of us to consider these exceptions, and assignments in detail. The great majority relate to the action of the court in admitting and refusing testimony, and to remarks of the court and opposing counsel in the course of trial. Especial stress is here made by counsel in argument and brief on the fact that the government's counsel was permitted to introduce in evidence written communications from the surety company, which set forth upon their printed heads the fact that its capital and surplus was over $1,000,000, because it is asserted in the brief that:

"It is difficult for a person, natural or artificial, to secure a fair trial in a case of this kind against the United States, and the line against evidence and argument of this character should be fairly and firmly drawn."

We are not prepared to concur in the assertion of fact contained in this proposition. Nor can we quite see what line can be firmly drawn against the introduction of a letter headed communication which letter head has been promulgated, published, and used by the surety company for no other purpose that we can conceive of than that of furnishing a brief, accurate description of itself, its address, its responsible officers, the nature of its business and its financial ability to conduct such business, and it is far from clear to us how such defendant could be prejudiced by this its own act, especially before a jury charged, as in this case, by the court that:

"The same principles of right and justice which prevail between individuals should control the construction and carrying out of contracts between the government and those who contract with it or its agents."

A careful examination of all this kind of exceptions has convinced us that they present no just ground of complaint on the part of the defendants, and they will be dismissed without further consideration. Others of these exceptions relate to the refusal of the court to give to the jury 27 special instructions or special prayers. The very number of these was calculated to confuse and mislead the jury, and a number were not at all warranted by the evidence. The court, we think, very wisely, concluded to give a general charge touching the matters in controversy, and, so far as we can see, fairly and impartially submitted to the jury the determination of the facts in dispute.

In this view of the matter but few legal propositions remain in the case for us to consider. First, under the terms of the contract, was the obligation upon Green, acting for the government, to furnish Graham with the railroad cars necessary for the transportation of the granite blocks from the quarry in Vermont to his yard in Baltimore?

The contract, as hereinbefore stated, required Graham to "transport from the quarry, cut, box and deliver complete" the granite

which was to be furnished by Green "free on board cars at the quarry." At the beginning a car famine existed, and Graham complained of the delay resulting therefrom. It is insisted that Green's obligation to deliver the granite "free on board the cars" required him to furnish the cars. On the other hand, it is insisted that Graham's obligation "to transport from the quarry, cut, box and deliver complete" required him to furnish the cars.

The court seems to have taken a middle ground and told the jury that:

· "In a contract of that kind, I think there was an obligation on both parties to furnish cars, that reasonable efforts should be made to accommodate each other."

[2, 3] It seems to us, without entering into an extended discussion of the question, that the lower court's construction of the law was very fair and liberal to defendants, for the general rule is pretty well established that, where the goods are bought f. o. b. cars, the obligation is upon the buyer to furnish the cars necessary in transportation. See 35 Cyc. 197, and authorities cited; also, note to Samuel M. Lawder & Sons Co. v. Albert Mackie Grocery Co., in 62 L. R. A. 795, where the proposition is discussed. A sound reason for this rule is apparent. The transportation company becomes by law agent or bailee of the buyer, in consequence the buyer, under all ordinary conditions and in the absence of contract provisions to the contrary, should be permitted to select the agent of his choice. It is true that this general rule may be shown to have been modified or reversed by the agreement or conduct of the parties, but there is nothing in the case here to cause us to believe that it was. But aside from this, Graham, if he desired to rely upon this delay as ground for abandonment of his contract, was required to act promptly at the time. For some months he complained of it, then, the car famine being over and the stone arriving in large quantities, he proceeded with the work and did a large part of it. This must be held in any event to be a waiver of any right he had, if any, to rescind.

[4] Second. Was this contract legally annulled by Green, whereby he was authorized, on behalf of the government, to finish the work at the contractor's cost?

It is most earnestly insisted by counsel for these defendants that it was not because, it is alleged, the rescission was not made "with the sanction of the Regents of the Smithsonian Institute."

It seems clear from the evidence that Graham proceeded with the work he had contracted to do during the whole time limit of the contract, and until it had, by tacit consent, been extended by Green for some months, then he discharged his men and told them to seek other employment, was requested by Green by letter to proceed with the work to the completion of the contract, and replied, through his attorney, that he had stopped work "for his financial welfare in view of the fact of the damage he has sustained * * * by reason of the manner in which this matter has been gone on with on the part of the government, and their agents in the matter." This was on March 14, 1908. On February 10, 1908, he had stated in a letter to

Green, "I intend to devote my entire, yard to museum work, until I see the job about completed." It is true that in his attorney's letter, from which we have first above quoted, the statement is made that "if this matter can be in any way amicably adjusted he should be glad to do anything that may be fair and equitable between the parties." What did he mean by this adjustment, the completion of the contract? Hardly, for he had discharged the men by whom the work would have had to be done and told them to seek other employment. Could he have meant anything else than that he had thrown up the contract, but was ready to compromise and adjust his claim of damages for delays for changes for larger stone furnished under the terms "net dimension blocks" and for times of payment? If this question is to be answered in the negative, then here was a clear abandonment of the contract which rendered its annulment by Green unnecessary. It must have been known by Graham that his remedy, after having gone on so far toward the execution of the contract, was not in its abandonment, but in its completion and the assertion afterward of claim for extra compensation because of such damages for which the Court of Claims was open to him to seek recovery.

But, in addition to this, it is argued with much force by counsel for the government that the clause in the contract limiting Green's authority to annul only with the consent of the Regents of Smithsonian Institute was void because the act of Congress conferred upon Green, and Green alone, the power to contract, and he had no authority to either delegate to or share with any other this power, all of which it was incumbent upon Graham by law to take notice of at the time of contracting. In support of this contention the case of Whiteside et al. v. United States, 93 U. S. 247, at pages 256, 257 (23 L. Ed. 882), is cited, where it is said:

"Different rules prevail in respect to the acts and declarations of public agents from those which ordinarily govern in the case of mere private agents. Principals, in the latter category, are in many cases bound by the acts and declarations of their agents, even where the act or declaration was done or made without any authority, if it appear that the act was done or declaration was made by the agent in the course of his regular employment; but the government or public authority is not bound in such a case, unless it manifestly appears that the agent was acting within the scope of his authority, or that he had been held out as having authority to do the act, or was employed in his capacity as a public agent to do the act or make the declaration for the government. Story's Agency (6th Ed.) § 307a; Lee v. Munroe, 7 Cranch, 376 [3 L. Ed. 373].

"Although a private agent, acting in violation of specific instructions, yet within the scope of his general authority, may bind his principal, the rule as to the effect of the like act of a public agent is otherwise, for the reason that it is better that an individual should occasionally suffer from the mistakes of public officers or agents, than to adopt a rule which, through improper combinations or collusion, might be turned to the detriment and injury of the public. Mayor v. Eschbach, 18 Md. 282.

"Individuals as well as courts must take notice of the extent of authority conferred by law upon a person acting in an official capacity, and the rule applies in such a case that ignorance of the law furnishes no excuse for any mistake or wrongful act. State v. Hayes, 52 Mo. 578; Delafield v. State, 26 Wend. [N. Y.] 228; People v. Bank. 24 Wend. [N. Y.] 431 [35 Am. Dec. 634]; Mayor v. Reynolds, 20 Md. 10 [83 Am. Dec. 535.]"

But, aside from all this, after carefully considering all the testimony and facts relating to this matter, we prefer determining it squarely upon the grounds and for the reasons given by the court below. In its charge it said:

"The proof is that the regents are a body of men who are constantly occupied, including the Chief Justice of the United States Supreme Court, the Vice President of the United States and United States Senators, and these men do not meet over three times a year, when they probably discuss and determine the general policies of the institution. It was said, and there was no proof to the contrary, that the practice is to leave all matters of detail and matters such as this to the secretary of the institution. For a long time they have allowed him to exercise those powers. Could it be said now that he has not the right to exercise those powers, and that the parties who deal with him in this way are not dealing with the proper person? The secretary, acting for the regents, gave his consent to the annulment in the proper manner. Mr. Green stated that in his judgment the contract should be annulled because of the failure of the defendant, and therefore the annulment was made. I can see no ground for saying to the jury that the contract was not annulled. I grant those prayers which say that there is no evidence to support the plea that the annulment was without the sanction of the Regents of the Smithsonian Institute. There is no evidence, in my judgment, to show that the annulment was the result of any bad faith on the part of Mr. Green. Mr. Green has acted within his rights, and as the agent of the government it was his duty to protect the interests of the government. I do not think he has gone beyond the limits of his powers."

[5] Finally, were such changes and alterations made in the contract without the surety company's consent as maintained in its special defense in this regard and which entitled it to release from its surety obligation?

This question, although elaborately argued, will need but brief consideration. The contract which the surety company guaranteed performance of in express terms provided that changes and modifications could be made and compensation should be allowed for extra work performed or material furnished. These changes and alterations were provided to be required in writing, it is true, and the letters produced in evidence between Green and Graham seem to us to be sufficient to meet all requirements in this particular. It is also shown that Graham and Green agreed on a sum of $4,000 for extra compensation for the extra labor performed and that he was given credit for this sum. In Atlantic Trust & Deposit Co. v. Town of Laurinburg, 163 Fed. 690, 90 C. C. A. 274, this court has determined that the rule of strictissimi juris will not be recognized as applying to contracts underwritten by these bonding corporations whose business it is to insure, for a monetary consideration, the obligee against a failure of performance on the part of the principal obligor. In such cases, before such bonding company can be released, it must show that the changes made in the contract guaranteed by it, operated injuriously to affect its right and liabilities.

We agree fully with the court below that there is no evidence in this case to support such plea.

There is no error in the judgment of the court below, and it will therefore be affirmed.