## GORDON WOODROFFE CORP. v. UNITED STATES.

### No. 49311.

United States Court of Claims.

June 3, 1952.

It was owned by a Belgian company known as Compagnie de Tramways et d'Eclairage de Tientsin, hereinafter referred to as the Tientsin Company.

The Tientsin Company advertised it for sale. Woodroffe, Limited, an English Company, secured an option on the machine, for which they agreed to pay Tientsin Company $457,665.00. It immediately got in touch with its American subsidiary, the Gordon Woodroffe Corporation, the plaintiff herein, in an effort to effect an advantageous resale of it. This company got in touch with Wallace G. Rouse Company, of 342 Madison Avenue, New York City, New York. The Rouse Company got in touch with its Washington attorney, T. W. D. Duke. Duke contacted George McGhee, so-called "Coordinator for Aid to Greece and Turkey." McGhee referred Duke to the aforementioned Walsh. Duke told Walsh about the machine and suggested a price of around $900,000.

Walsh, on December 31, 1947, wired the American Administrator for Aid to Greece asking him if he was interested in the machine, without mentioning the price at which it was tentatively offered. The Administrator replied that he was interested and asked for additional information.

Drawings and specifications of the machine were given Walsh by Rouse, Duke's client, and these were transmitted by him to the American Administrator for Aid to Greece.

Some time elapsed and Woodroffe Limited's option to purchase the machine was about to expire, and they and its American subsidiary, through Rouse and its Washington attorney, Duke, continued to press Walsh for an answer.

Walsh had not heard from the Administrator for Aid to Greece. Finally, on February 5, 1948 he was able to reach over the phone Mr. Reginald Gillmor, who was the Chief of the Industry Division of the American Mission for Aid to Greece. The telephone connection was very bad, but Walsh did hear Gillmor say that the Board of Directors of the Athens Piraeus Electricity Company, Limited, had decided to purchase the unit, subject to inspection.

Raymond M. Tierney, New York City, for the plaintiff. Jackson, Nash, Brophy, Barringer & Brooks and John B. Garrity, New York City, were on the briefs.

John B. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Holmes Baldridge, for the defendant. Joseph T. Keating, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

This case turns on whether a man by the name of Aloysius J. Walsh, in the State Department, had authority to bind the United States. He contracted to purchase, allegedly acting for the American Mission for Aid to Greece, a turbo-alternator-generator for $906,000.00. It was intended for use by the Athens Piraeus Electricity Company, Limited. This company later purchased it for $524,400.00.

If Walsh had the authority to act for the Mission to Greece, we think the United States is liable, however great may be the disparity between the price he agreed to pay and what appears to have been a fair price.

It is probably best to leave to a later part of this opinion the question of his authority and to recite, first, the dealings leading up to the agreement to purchase this machine.

Walsh immediately wired plaintiff, over the signature of Walter Wilds, Deputy Coordinator for aid to Greece and Turkey, accepting "this unit for and on behalf of the American Mission for Aid to Greece and the Athens Piraeus Electricity Company."

If he had the right to send this telegram, the United States is bound.

By the Act of May 22, 1947, 61 Stat. 103, 22 U.S.C.A. § 1401 et seq. Congress appropriated several hundreds of millions of dollars, which it authorized the President to spend for financial aid to Greece and Turkey.

This authority is stepped down as follows: The President transmitted his authority to the Secretary of State. His order doing so, number 9857, 22 U.S.C.A. § 1405 note 12 Fed.Reg. 3331, in section 2, reads as follows:

"The Chief of Mission to Greece or Turkey appointed by the President pursuant to section 8 of the act shall, under the guidance and instructions of the Secretary of State, direct United States activities within Greece or Turkey, as the case may be, in furnishing assistance under the act. The Secretary of State may delegate to the Chief of Mission such powers or authority conferred by this order as he may deem necessary and proper to the effective carrying out of the provisions of the act and of the basic agreement with the Government of Greece or Turkey, as the case may be, setting forth the general terms and conditions under which assistance is to be furnished."

Then the Secretary of State issued a so-called Manual which in section 031.1 read as follows:

"The Chief of the American Mission for Aid to Greece shall, under the policy guidance and instructions of the Secretary of State, direct all United States activities within Greece in furnishing assistance to Greece under the Act to Provide for Assistance to Greece and Turkey, approved May 22, 1947, Public Law 75, 80th Congress (hereinafter referred to as the Act). The chief of mission is hereby authorized to exercise, in the performance of this function, any powers or authority vested in the Secretary of State by Executive Order 9857, dated May 22, 1947, which the chief of mission may deem necessary and proper to the effective carrying out of the Act and of the basic agreement with the government of Greece setting forth the general terms and conditions under which assistance is to be furnished."

The end result of all this is that the Chief of the American Mission for Aid to Greece, who under the Act of Congress was appointed by the President, with the advice and consent of the Senate, was—to use a colloquial, but familiar expression—the boss of the job, subject, of course, to the orders of the Secretary of State and of the President. While his authority was subject to the orders of the Secretary of State and of the President, it is clear that in the absence of orders from one of these two men, in person, and not through subordinates acting on their own initiative, he was the boss.

Dwight P. Griswold was appointed by the President and confirmed by the Senate as the Chief of the American Mission for Aid to Greece. Neither he nor any of his assistants had any dealings with plaintiff that could possibly have resulted in a contract to purchase this machine.

The confusion—if any there should have been—developed out of the establishment by the Secretary of State of an office known as "The Office of the Coordinator for Aid to Greece and Turkey," and the assumption by one of the subordinates in that office of a prerogative he did not have. The Secretary of State appointed George Crews McGhee as the Coordinator, and Walter Wilds as his Deputy. Aloysius J. Walsh was one of his two, so-called, special assistants.

It is plain, however, that the Coordinator, appointed by the Secretary of State, was not the superior of the Chief of the American Mission for Aid to Greece, who had been appointed by the President with the advice and consent of the Senate. The Coordinator and his associates, of whom Aloysius J. Walsh was one, acted as the

Washington "contact men" for the Mission to Greece. They did not control that Mission; they were set up to aid it, and to render such assistance as the Mission might request.

■ Walsh, special assistant to the Coordinator, on his own authority, nor on the authority of the Coordinator, had no right to commit the funds which Congress had appropriated for aid to Greece.

This brings us down to whatever authority he may have derived from his telephone conversation on February 5, 1948 with Gillmor, Chief of the Industry Division of the American Mission for Aid to Greece. It is necessary to state the background of that conversation, and that is going to extend this opinion much beyond what the writer desires, or the readers—other than the parties litigant—may be willing to endure.

While the negotiations were going on in America between Walsh and the Woodroffe Corporation, represented by Rouse and Duke, the Athens Piraeus Electricity Company had been undertaking to purchase the machine from Tientsin through a broker located in Athens, Greece, referred to in the record as Loukidis. Tientsin and the Athens Piraeus Electricity Company finally agreed on a price of 23,000,000 Belgian francs, equivalent to about 524,400 American dollars, subject to confirmation by the London financial agents of the Athens Piraeus Electricity Company.

This agreement was made after a meeting had been held with officials of the Grecian government and representatives of the American Mission for Aid to Greece, to arrange for a license to import the machine and to make available the necessary foreign exchange. The American Mission for Aid to Greece's role in these negotiations was limited to advising Athens Piraeus Electricity Company relative to the purchase of the machine and in making available the necessary foreign exchange. It was in no sense the prospective purchaser. The prospective and eventual purchaser was the Athens Piraeus Electricity Company.

Just after the conference with officials of the Grecian government and the American Mission for Aid to Greece, Walsh reached Gillmor over the phone. When Gillmor told Walsh that the Athens Piraeus Electricity Company had decided to purchase the machine, he was referring to the negotiations between Tientsin and the Athens Piraeus Electricity Company and the conference the latter company had just had with the Grecian officials and the American Mission for Aid to Greece relative to Tientsin's offer to accept $524,400 for the machine. He did not have in mind the offer of Woodroffe Corporation to sell the machine to the American Mission for Aid to Greece for $906,000.

His conversation with Aloysius J. Walsh gave that person no authority to commit the Mission to Greece to purchase the machine at all, whatever the price, and certainly not for $906,000, when an agreement had just been reached on a price of $524,400.

As a matter of fact, Dwight P. Griswold, the Chief of the American Mission for Aid to Greece, wrote the Secretary of State on January 28, 1948, reading in part as follows:

"For your information I have had repeated cablegrams and a telephone call from Gordon Woodroffe & Co., Ltd. of London who are apparently the London agents represented by Wallace G. Rouse Company in New York. I have advised Gordon Woodroffe & Co. Ltd. by cable that prior to receipt of their cables or of the information sent to us by Washington, we had entered into negotiation with the agent of the owners in Athens and that we would continue our negotiation with the Athens representative and would not send a representative to meet a representative of Gordon Woodroffe & Co. Ltd. either in London, Brussels or elsewhere.

"Notwithstanding the statement attributed by you to Wallace G. Rouse Company that they have exclusive right to this unit, we have assured ourselves regarding the credentials of the Athens representative who, incidentally, has presented to us a letter from the owner authorizing him to sell the unit for 25,-000,000 Belgium [Belgian] francs as

compared with the $900,000 at which we understand it was offered to you. * * *"

This letter was approved by Gillmor, with whom Walsh had his conversation.

(In fairness to Walsh, it must be said that when he talked to Gillmor over the phone he did know of the above letter of January 28, 1948.)

Walsh did not have even a vestige of authority to bind the United States, whatever he may have adduced from his telephone conversation with Gillmor. If his conversation with Gillmor did not give him the authority, he did not have it. Plainly, it did not. See Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10; G. S. Kincaid v. United States, 96 F.Supp. 468, 119 Ct.Cl. 257, 287–288.

Plaintiff probably has a just cause for complaint against Tientsin for having dealt with Athens Piraeus Electricity Company while its option to plaintiff's parent company was outstanding, but it has none against the United States.

Woodroffe Limited finally exercised its option to purchase the machine from Tientsin, and then resold it to Athens Piraeus Electricity Company. It paid Tientsin 21,-000,000 Belgian francs, and received from Athens Piraeus Electricity Company 23,-000,000 Belgian francs.

Plaintiff's petition will be dismissed.

JONES, Chief Judge, and LITTLETON, Judge, concur.

MADDEN, Judge (dissenting).

The court's decision denies enforcement to a contract purportedly made on behalf of the United States by officers of the United States. The denial is upon the ground that those agents lacked authority to contract for the United States. I think the court is wrong in its conclusion that they lacked authority.

The President was, by the act of May 22, 1947, 61 Stat. 103, authorized to spend money appropriated for financial aid to Greece and Turkey. By section 4 he was authorized to purchase articles for transmission to those countries. By section 5 he was authorized to delegate his powers under the statute to such department, agency, independent establishment, or officer of the Government as he might direct. By Executive Order 9857 dated May 22, 1947, he authorized the Secretary of State to exercise any of the powers given to the President, through such departments, agencies, and independent establishments of the Government as he might designate. He authorized the Chief of Mission to Greece or Turkey to, "under the guidance and instructions of the Secretary of State, direct United States activities within Greece or Turkey, as the case may be, in furnishing assistance under the act."

Mr. Griswold having been appointed Chief of the American Mission for Aid to Greece, the Secretary of State appointed George C. McGhee, Coordinator, Walter Wild, Deputy Coordinator and Aloysius J. Walsh one of two special assistants to the Coordinator. These few men were the representatives and spokesmen, in the State Department's Washington office, of a project which had some hundreds of millions of dollars to spend.

Mr. Duke, a representative of the plaintiff, went to Mr. McGhee for the purpose of selling the electric plant here involved to the Government, for transmission to Greece. Mr. McGhee personally took Mr. Duke to Mr. Walsh, saying that Mr. Walsh was the person to talk to. After extended negotiations, Mr. Walsh agreed to the purchase of the plant and his immediate superior, Mr. Wild, the Deputy Coordinator, signed the telegram to the plaintiff accepting the plaintiff's offer and purporting to close the contract.

The court's decision concludes that Mr. Wild and Mr. Walsh did not have authority to do what they did. I think they did have authority. They had been put, by the Secretary of State, into an office which had a title which indicated responsibility. There is not the slightest evidence that Mr. McGhee, the Coordinator, or General Marshall, the Secretary of State, would not have personally signed the telegram of acceptance if that had been the habit of the department. That it was not the practice

was natural because the statute and the Executive Order expressly authorized by the Statute permitted sub-delegation, and the Secretary's appointment of the officials to their designated positions constituted that sub-delegation, and removed the necessity of having papers formally signed by high officials who had, in fact, given no consideration to their content. The court's opinion treats Mr. Walsh's communication with the agents of the Mission in Greece as evidence that he himself did not have authority to purchase, except as he obtained delegated authority from them. I do not so regard it. If an enterprise appointed one person, and one person only, as its authorized purchasing agent, it would be only sensible for him, before he purchased something for use in a distant branch of the enterprise, to consult the persons who were there as to what they needed, and as to whether the thing which he had an opportunity to buy would suit them. In the instant case, where the people in Greece also had authority to purchase, it was natural that Walsh should consult them for the further purpose of learning whether they had obtained the thing needed from another source.

The court's opinion cites Federal Crop Insurance Corporation v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10. In that case the action of the agent which the court held to be unauthorized was directly in the teeth of a valid official rule, promulgated pursuant to a statute, published in the Federal Register, and having the force of law. In the instant case the statute, the Executive Order pursuant to the statute, and the appointment of Wild and Walsh to the offices they held, all support the authority which they, in fact, assumed to exercise.

If, as the court thinks, there is reason to doubt the authority of Wild and Walsh to do what they did, I think the court should reopen the case to take evidence as to what these officers did, in fact, as to other trans-actions. If, as one may suppose, they made numerous contracts of purchase of things to be sent to Greece, that would seem to eliminate any doubt as to whether they were authorized to do so.

The real problem in this case is that, because of an indistinct telephone conversation and a miscarriage of mail, two agencies of the Government were acting at cross-purposes. The Washington agents were being offered an electric plant, by the plaintiff which had it for sale, at a price considerably higher than the agents in Greece were being offered it by one who, at the time, had no power to sell it. Except for the mistake, the Washington authorities would not, of course, have made the contract. By waiting for the plaintiff's option to expire, the plant, could have been bought for the lower price. But, as I see it, the case is not different from one which might well occur in any large establishment which acts through many agents. Someone authorized to purchase says, we offer $100 per unit. By a mistake in typing, or in the hearing of a telephone conversation, the offer is transmitted to the offeree as being an offer of $200 per unit. The $200 is not so obviously out of line as to put the offeree on notice that it involves, or probably involves, a mistake. The offeree accepts the offer. A contract at $200 per unit is thus made. In this regard, I think there is no difference between the position of the Government and that of a private enterprise. When the Government abandoned its immunity from suit I think it did not intend to assume the status of an infant or an idiot who could repudiate his contracts if they did not turn out to be advantageous.

I would give the plaintiff a judgment.

I am authorized to state that Judge HOWELL joins in the foregoing dissenting opinion.