BYRNE ORGANIZATION, INC.,
v.
UNITED STATES.

GARDNER DISPLAYS OF NEW YORK, INC.,
v.
UNITED STATES.

Nos. 286–53, 287–53.

United States Court of Claims.
March 1, 1961.

Geoffrey Creyke, Jr., Washington, D. C., for plaintiffs; Hudson & Creyke, Washington, D. C., on the briefs.

M. Morton Weinstein, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant.

LARAMORE, Judge, delivered the opinion of the court:

This suit was originally two actions brought by plaintiffs to recover a sum of money which plaintiffs allege is due

them under separate contracts with defendant's National Capital Sesquicentennial Commission. These actions were consolidated for purposes of trial with the consent of the parties and pursuant to the court's order of October 19, 1955.

Plaintiffs seek a money judgment against the United States basing their claim alternatively upon either the terms of a written unexecuted contract or on the reasonable value of the services rendered under letters of intent dated October 20, 1949. The defendant denies all liability and presents a counterclaim demanding return of all moneys previously paid.

The facts are summarized as follows: Late in 1946, at a Washington citizen's meeting, a plan to sponsor legislation for an appropriate commemoration, in 1950, of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia, was adopted. As a result of this meeting a committee was organized and they drafted a bill for congressional action. This bill led to the passing of a Joint Resolution by Congress, July 18, 1947, 47 Stat. 396, creating the National Capital Sesquicentennial Commission. Section 4 of this resolution provided that the Commission should select an executive vice chairman and might employ a director. Pursuant to this section, Carter T. Barron was elected executive vice chairman, and became the chief administrative officer of the Commission. At the same time an executive committee was established and authorized to act for the Commission. In June 1948, Mr. Edward Boykin was appointed director. Proposed plans for a sesquicentennial celebration were studied and developed during 1948–1949, and many proposals were considered.

On June 25, 1948, 62 Stat. 1034, Congress appropriated $15,000 for expenses necessary for the Commission to carry out a program of commemoration, and by a Joint Resolution of May 31, 1949, 63 Stat. 140, Congress authorized the Commission to proceed with plans for the celebration. No description of the celebration was specified.

In August 1948, George M. Rowland, vice president of plaintiff (Gardner), after reading an account of the proposed celebration in a New York newspaper, came to Washington, D. C., to see Mr. Boykin with regard to plans for the celebration. He was aware that no funds were available to compensate him for any services he might render, and he was cautioned that he was operating on his own, voluntarily, in soliciting business. Mr. Boykin did tell him that if any of his proposals were acceptable to the Commission, Boykin would recommend that Gardner receive a contract. At the same time Mr. Boykin informed Mr. Rowland that, as director, he had no authority to give Gardner any business.

Director Boykin was in charge of the overall planning for the celebration. These plans were taken up individually, item-by-item, by the executive committee and most of them were approved. These original plans were known as Plan A. The plans that were approved were executed in connection with the sesquicentennial celebration and are not directly involved in this action. Subsequent plans to produce an exposition in the nature of a world's fair, popularly called Freedom Fair, became part of Plan B. It is in connection with Plan B that activities lead to the litigation involved in the instant case.

The general theme of Freedom Fair was conceived by Gardner and it was presented to the Commission on April 15, 1949. However, expert advice with regard to accurate estimates and construction of Freedom Fair was required before any definite plans could be initiated. Minor Hudson, attorney for Gardner, and previously attorney for Byrne, suggested to Mr. Barron that Byrne be contacted for this purpose. Byrne agreed to volunteer services with the hope of eventually receiving a contract for architectural, engineering, and construction management services for Freedom Fair, when and if an adequate appropriation

was obtained and the proposed fair became a reality.

On June 27, 1949, Byrne presented Mr. Barron with a budget of estimated cost and income expected from Freedom Fair:

Total Cost $17,888,750.
Advanced Requirements $15,112,500.
Income $20,875,000.
Profit $2,986,250.

A meeting of the commission was then held on June 28, 1949, and these figures were presented. It was the opinion of the majority, including Carter Barron, that such an ambitious and extensive program should not be undertaken until firm commitments from industry were obtained to purchase sufficient exhibit space to make the project feasible. These commitments were never obtained.

Carter Barron was very enthusiastic about plans for Freedom Fair from the initial conception of the idea. He was so anxious to make the plans a reality that he preferred to make such progress as he could without taking up all matters with the commission.

From the very beginning the prospect of making Freedom Fair a reality encountered various legal difficulties, due mainly to the restrictive nature of the enabling legislation which created the Sesquicentennial Commission. Minor Hudson, a registered lobbyist for both plaintiffs and a legal advisor to Carter Barron, suggested that the only possible solution to the problems would be to form a private, non-profit corporation, to plan, build, operate, and enter into the various contracts necessary to put on Freedom Fair. Consideration was given to a plan to have the legislation amended to include authority to form a non-profit corporation. Attorney James Howe, on loan from the White House Staff, advised both Barron and Hudson that the formation of the proposed corporation was contrary to the Government Corporation Control Act, 59 Stat. 597, 31 U.S.C.A. § 841 et seq., unless specifically authorized by Congress. He further advised them that the legislation passed on May 31, 1949, did not include this authority.

Further, Mr. Howe strenuously objected to proposed contracts by Byrne and Gardner, as drafted by Minor Hudson. On August 23, 1949, by way of a memorandum addressed to Mr. Boykin, Howe submitted his objections to the proposed contracts, and he orally advised Barron that as executive vice chairman he had no statutory authority to execute such a contract.

In order to obtain an appropriation from Congress both Messrs. Barron and Boykin testified before the House Committee on Appropriations and the Senate Subcommittee of the Committee on Appropriations. Both men made it quite clear that only $600,000 of the requested $3,000,000 would be used for Plan A, and that the remainder would be a "capital prestige loan" to be used only after other income producing sources made the operation of the fair feasible.

On October 14, 1949, 63 Stat. 872, Congress appropriated $3,000,000 for the Commission. Immediately after the appropriation was enacted, Minor Hudson prepared letters of intent addressed to his clients and delivered them to Mr. Barron for signature. On or about November 1, 1949, Carter Barron sent unsigned drafts of the letters of intent to Mr. Boykin to read and return. Boykin discussed the matter with attorney Howe, who advised Boykin the letters of intent were out of order and that there was no authority to execute them. Boykin conferred with Carter Barron on a number of occasions about the letters, informing Barron that he (Barron) had no authority to execute them. These letters remained on Boykin's desk approximately three or four weeks without signatures. Minor Hudson went to Boykin's office and told the secretary that Carter Barron had requested that she retype the letters of intent in final form for his signature. She complied with this request. Later, these letters, dated October 20, 1949, were signed by Carter Barron.

Mr. Barron had neither requested nor received authority from the Commission to issue letters of intent to plaintiffs, nor did he notify the Commission of his in-

tention to give letters of intent to plaintiffs.

In the meantime, on October 19, 1949, Minor Hudson prepared a letter for Carter Barron to the Attorney General for an opinion as to whether the Commission had authority to form a non-profit corporation. He was informed of the Attorney General's negative opinion on November 23, 1949, the same day he had the letters of intent retyped, but suggested a formal answer would not be necessary as he would withdraw the inquiry.

No meetings of the Commission or executive committee were held between June 28, 1949 and November 17, 1949. Shortly after the appropriations bill was passed by the Congress on October 14, 1949 the chairman of the executive committee, Mr. McGarraghy, attempted to arrange an executive committee meeting, but was told by Mr. Boykin that there was nothing to present to the executive committee on which it might take action. However, a meeting of the executive committee was held on November 17, 1949, at which time, Walter Bastian was designated as general counsel for the Commission. Mr. McGarraghy requested at this meeting that a report be prepared for submission at the next meeting of the executive committee, on December 2, 1949, of all commitments made by the director and the executive vice chairman in behalf of the Commission. At the following meeting of the executive committee on December 2, 1949, Mr. Barron's report on commitments was presented with the various letters of intent, including those to plaintiffs, Gardner and Byrne. The committee members had not previously seen or heard of the letters of intent signed on behalf of the Commission and all were surprised that Barron had taken these steps without approval. Neither the plaintiffs' letters of intent nor their proposed contracts were affirmed or disaffirmed by the executive committee at this meeting or at a prior or subsequent meeting of the executive committee or the Commission.

At the next executive committee meeting, December 9, 1949, details of the proposed contracts for plaintiffs and others receiving letters of intent were explained in detail, but action was deferred until another meeting of the executive committee to be held at a later date. At a subsequent meeting, held on December 16, 1949, Carter Barron again requested authority to execute the contracts. However, no action was taken regarding this request. Instead, the executive committee decided to recommend to the Commission at its next meeting, on December 30, 1949, that the opening of Freedom Fair be postponed until April 1951. The executive committee determined that it should review all existing commitments, and Director Boykin was instructed to temporarily defer all work on Freedom Fair pending this review. On January 3, 1950, Director Boykin sent notice to Byrne to "discontinue" all plans and specifications that plaintiff was working on as a result of the letter of intent dated October 20, 1949. Also, on January 5, 1950, he sent a letter to Gardner to "hold up" on plans being worked on as a result of the October 20, 1949, letter of intent.

On March 1, 1950, pursuant to a previous recommendation of the executive committee, Carter Barron was authorized to contact Paul Massman, to be employed as general manager of Freedom Fair, for the purpose of further exploring the feasibility of having the Fair. After being employed, Mr. Massman immediately abandoned the concept as had been presented by plaintiffs. However, plaintiffs did perform some additional services, including sketches of the new design and estimated costs.

On March 1, 1950, another opinion by the Attorney General was requested with respect to the authority of the Commission to grant to a non-profit corporation the rights and privileges necessary to enable such corporations to build and operate Freedom Fair. On May 4, 1950, the Attorney General informed the Commission of the previous inquiry and advised that the Attorney General was of the same negative opinion. In view of this opinion, the executive committee, at a meeting May 10, 1950, approved a rec-

ommendation that plans for Freedom Fair be abandoned. At the next meeting of the full Commission, held June 1, 1950, the plan to hold Freedom Fair was abandoned by the Commission. Thereafter, plaintiffs submitted their claims to the Commission, which, in turn, recommended to the General Accounting Office that claimants be allowed reasonable out-of-pocket expenses, as well as a reasonable percentage of profit. The General Accounting Office issued a settlement of claim notice on September 9, 1952, allowing Byrne the sum of $5,814.94; and on October 20, 1952, allowed Gardner $4,138.46. Plaintiffs rejected the settlements and filed their petitions in this court. Plaintiff Byrne had received three payments from the Commission totaling $35,119.83. The defendant alleges these payments were made to Byrne under the mistaken belief the Commission had authorized these payments, and sues now to recover this amount by way of counterclaim.

■ Turning to their first contention, the facts in this case clearly indicate, and plaintiffs concede, that the definitive contract involved was never executed by the defendant or any agent of the defendant. As a general rule, the mere fact that the parties intend a subsequent contract to be made is evidence that they do not intend the previous negotiations to be binding. In the present fact situation it is clear the defendant never acceded to the terms of the definitive contract and, therefore, the defendant is not bound by the terms of the contract for the obvious reason that future negotiations were required. Ship Construction & Trading Co. v. United States, 1940, 91 Ct.Cl. 419, 456.

■ Plaintiffs next contend they are entitled to recover an equal sum of money, measured not on the terms of the definitive non-executed contract, but measured as the reasonable value of their services rendered by relying on letters of intent issued by the executive vice chairman of the Commission. Plaintiffs claim, and the court agrees, that it is clear from an examination of the legislation creating the Commission that Congress authorized the Commission to enter into contracts on behalf of the United States. But it does not follow that an agreement signed by an agent or officer of the Commission is binding on the Commission or the Government. Actually the converse is true. No officer of the Government has the power to bind the United States, in the absence of congressional authority. George H. Whike Construction Company v. United States, 1956, 140 F.Supp. 560, 135 Ct.Cl. 126, 131. To hold a contrary result could conceivably create a situation where two collusive people could effect a drain of the public treasury. Since the early history of this court, it has been consistently held that the Government is not bound by the acts and declarations of its agent, unless it appears that he acted within the scope of his authority. Whiteside v. United States, 1876, 93 U.S. 247, 257, 23 L.Ed. 882. These cases conform with the basic principles of agency that one dealing with an agent must look to his authority. Persons dealing with the Government must take notice of the extent of the authority which the Government has given its agents. Hawkins v. United States, 1877, 96 U.S. 689, 24 L.Ed. 607; Riethmiller v. United States, 1944, 101 Ct.Cl. 495.

In Gay Streit Corporation of Baltimore v. United States, 1955, 127 F.Supp. 585, at page 589, 130 Ct.Cl. 341, at page 348, this court reviewed a similar problem and stated:

"The courts have consistently held that anyone entering into an agreement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. 'And this is so even though * * * the agent himself may have been unaware of the limitations upon his authority.' Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384 [68 S.Ct. 1, 3, 92 L.Ed. 10]; Whiteside v.

United States, 93 U.S. 247, 257 [23 L.Ed. 882]; United States v. Holley [5 Cir.], 199 F.2d 575; Reconstruction Finance Corp. v. Martin Dennis Co. [3 Cir.], 195 F.2d 698.

"In United States v. Willis [4 Cir.], 164 F.2d 453, the Circuit Court of Appeals held that one who deals with an agent of the Government must look to his authority, which will not be presumed but must be established, and one who deals with such an agent cannot rely upon the scope of dealing or upon the apparent authority of such an agent.

"This court held in Jacob Reed's Sons, Inc. v. United States, 60 Ct. Cls. 97, affirmed, 273 U.S. 200 [47 S. Ct. 339, 71 L.Ed. 608], and A. L. Ferguson v. United States, 60 Ct.Cls. 649, affirmed, 273 U.S. 660 [47 S.Ct. 345, 71 L.Ed. 827], that one dealing with the United States is bound to know and take notice of the limited authority of an officer with whom he was dealing and the court will not imply that such an officer was acting under proper authority."

■ Following the above authority, and considering all the facts in this case, we hold that Carter Barron was without authority when he issued "letters of intent" to the plaintiffs. Furthermore, the court concludes that this case is clearly not an instance where the Government agent was dealing with inexperienced persons against whom knowledge of the legal limitations upon Government officers should not be implied. Gay Street Corp. v. United States, supra. On the contrary, here we have experienced contractors who relied on the advice of a highly experienced lawyer, who had long dealt with Government contracts. Plaintiffs, admittedly, began as volunteers with the hope of obtaining a highly lucrative contract. When this contract did not materialize, they sought by way of a lawsuit to reduce the expenses they had incurred in attempting to induce the contract. The court as guardian of the public treasury does not turn a deaf ear to the demands of the plaintiffs but determines they are unwarranted.

■■ Likewise, the argument urged upon us by the plaintiffs that the Government is estopped to deny the validity of the "letters of intent" must fail because we have determined the acts of the Government's agent were unauthorized. It is an established proposition that estoppel cannot be set up against the Government on the basis of an unauthorized representation or act of an officer or employee who is without authority in his individual capacity to bind the Government. Ship Construction & Trading Co. v. United States, supra. Nor can we ascertain any ratification of these agreements considering the actual circumstances in this case. The letters of intent were not actually signed by Carter Barron until November 23, 1949, and at the next meeting of the Commission, on December 2, 1949, this fact was disclosed. The Commission expressed surprise with the actions of Mr. Barron which were discussed and argued, but not ratified. The fact that his actions were not endorsed served as notice to the plaintiffs that the letters of intent were not ratified, the plaintiffs being very much aware of all proceedings by the Commission. This was positively shown by the record which establishes the fact that plaintiffs' lawyer was also actively engaged in advising the executive vice chairman of the Commission.

Therefore, we hold that the plaintiffs were volunteers, their status never charged, and as such are not entitled to any further remuneration.

The defendant has urged the court to determine these letters of intent to be invalid on the ground that they were executed as the result of undue influence. Considering the conclusion we have reached there is no need to make such a determination.

■ The defendant's counterclaim likewise must fail. The defendant does not deny that this money was expended

pursuant to a plan that was intended to benefit the Government. Although the plan never became a reality, actual expenses were incurred in determining the feasibility of executing such a plan. Conceding that these expenses were incurred voluntarily until November 23, 1949, and further conceding that they were incurred as the result of unauthorized letters of intent until December 2, 1949, still a full month passed during which time the Commission was aware plaintiffs were incurring expenses. The Commission was informed, on December 2, 1949, that letters of intent had been issued. In spite of this intelligence, the Commission did not formally notify plaintiffs of a decision to cease work in process for over a month. Although we have determined that this delay did not amount to a ratification of the action of the executive vice chairman, nevertheless, in fairness to the plaintiff we think the parties should be placed substantially in the position they would have occupied without the attempted contract. New York Mail and Newspaper Transportation Company v. United States, 1957, 154 F.Supp. 271, 139 Ct.Cl. 751, 759. This can effectively be accomplished by denying defendant's counterclaim. Moreover, as the amount of the counterclaim involved is substantially less than the amount expended, as determined by the Commissioner's finding, and the Government did receive the benefit of the services involved, the ends of justice would best be served by leaving the parties in the same position their mutual actions placed them.

For these reasons we conclude the plaintiffs are not entitled to recover on their petitions, and the defendant is not entitled to recover on its counterclaim.

The petitions and the counterclaim will be dismissed.

It is so ordered.

JONES, Chief Judge, and DURFEE, MADDEN and WHITAKER, Judges, concur.