SAM GRAY ENTERPRISES,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–704C.

United States Court of Federal Claims.

May 5, 1999.

Gene M. Connell, Surfside Beach, South Carolina, attorney of record for plaintiff.

Michael D. Austin, Washington, D.C., Department of Justice, with whom was Acting Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

ALLEGRA, Judge.

This government contract case is before the court on defendant's motion to dismiss and cross-motions for summary judgment. At issue is whether the United States entered into a contract with Sam Gray Enterprises to house employees of government contractors who were working on a drug interdiction program in the Bahamas. Alter carefully reviewing the submissions of the parties, and following oral argument, the court concludes that defendant's motion for summary judgment should be granted.

### A. Facts

In the mid–1980's, the United States Customs Service (Customs Service) maintained a radar surveillance operation as part of a drug interdiction program in the Bahamas. In 1986, the Customs Service awarded a contract to Westinghouse, Defense and Electronics Systems Company (DESCO), for the production and delivery of a tethered aerostat system to be installed at George Town, Great Exuma Island, Bahama. In August 1989, representatives of the Customs Service, DESCO, and the United States Coast Guard (Coast Guard) met to discuss the shortage of housing in George Town, Bahamas for DESCO personnel working on the aerostat project.

On August 30, 1989, Sam Gray, Jr., a citizen and resident of the Bahamas involved in the real estate business, sent a "Proposal to Provide Housing for DESCO Personnel" to B. Portell, Deputy Program Manager of DESCO. The document stated that "this proposal is in response to a verbal request from Mr. B. Portell to provide housing for twenty-six DESCO persons who will be operating the U.S. Customs/US Coast Guard Aerostat Site." The proposal detailed the location of an apartment building to be built by plaintiff and the amenities to be included in the apartment units. The proposal further stated:

8. To implement this proposal a letter of commitment to occupy will be required. No money will be required. The letter of commitment to occupy should state a minimum obligation of five (5) years with the necessary contingent should it be mutually and beneficial to terminate, or extend this agreement.

9. The lease agreement should provide for a monthly lease payment of 28,500 U.S. dollars....

10. Construction will begin immediately upon receipt of your acceptance of this proposal and will be completed within six (6) months from go-ahead.

On September 13, 1989, Raymond D. Mintz, the Director of the Office of Enforcement Support at the Customs Service, wrote to Martin Cheshes, the Deputy Chief of Mission at the United States Embassy in the Bahamas, advising that the Customs Service had directed DESCO to locate and lease housing for aerostat site personnel in George Town, Bahamas. Mr. Mintz further informed Mr. Cheshes that the preferred housing proposal was "to lease a housing complex for an anticipated term of 5 years." Mr. Mintz added: "Since this housing has yet to be built, the implementation of the proposal requires DESCO to provide a letter of intent/commitment to lease. DESCO is prepared to provide this upon receipt of our notification to proceed." Mr. Mintz also asked Mr. Cheshes to "coordinate with any interested U.S. Government parties" who

might be interested in leasing space in the subject housing complex.

On October 24, 1989, Ernest Wims, a contracting officer for the Customs Service, wrote to Robert Clark of DESCO and expressed "the U.S. Customs Service interest in acquiring 24 housing units from Mr. Sam Gray as presented to us at our meeting with DESCO and U.S. Coast Guard Personnel on August 31, 1989." Mr. Wims also requested that "DESCO pass on to Mr. Gray our interest in 24 units and verify what is the break-even point for Mr. Gray to permit him to begin construction." By letter dated November 6, 1989. Mr. Wires notified J.A. Nowotny, a contracting officer for the Coast Guard, that the "U.S. Customs Service has confirmed with DESCO the intent/interest in acquiring 24 housing units ... from Mr. Sam Gray in Georgetown, Bahamas." Mr. Nowotny responded to Mr. Wims on November 16, 1989, advising that the Coast Guard recommended obtaining housing from Mr. Gray. Mr. Nowotny further stated, "[p]lease direct DESCO to coordinate the construction of this housing facility with the American Embassy in Nassau, Bahamas, and assure that, Mr. Gray is sent an appropriate letter of intent. . . . Mr. Gray requests that he receive a letter of intent so that he may begin construction of an appropriate amount of housing units."

On November 28, 1989, Mr. Wims, with the written concurrence of Mr. Nowotny, sent a letter to Mr. Clark of DESCO, stating: "[t]he U.S. Customs Service has been requested by the U.S. Coast Guard to direct DESCO to coordinate the acquisition of housing for the Coast Guard through the American Embassy in the Bahamas and to arrange for a letter of intent to be provided by the Embassy to Mr. Gray." Thereafter, on November 30, 1989, Martin Cheshes, as the Charge d'affaires of the United States Embassy in the Bahamas,[1] wrote Mr. Gray, stating:

> This letter is to confirm our understanding reference the leasing of housing for Cariball II personnel. The United States

Coast Guard and Customs Service intend to lease housing from Sam Gray Enterprises for twenty four individuals for a five year period, upon completion of construction or June 1990, whichever comes first. The United States agrees to the cost as quoted in the original proposal, and expects exclusive rights to the specified housing for the full five year period.

Mr. Gray then wrote back to Mr. Cheshes on January 10, 1990, thanking him for his letter and asking him to "confirm this letter to Mr. R. Sands, the Manager of the George Town Branch of the Bank of Nova Scotia and also let him know that you would be paying the rents direct to the bank to my credit." Mr. James Bumpus, the Narcotics Coordinator for the United States Embassy in the Bahamas, subsequently wrote to Mr. Sands of the Bank of Nova Scotia on January 19, 1990, stating:

> Mr. Samuel Gray, Jr., has asked that I write to inform you that the United States Coast Guard and Customs Service intend to lease housing from Sam Gray Enterprises for twenty-four individuals for a five year period, upon completion of construction or June 1990, whichever comes first. The United States agrees to the cost as quoted in the original proposal, and expects exclusive rights to the specified housing for the full five year period.

> At Mr. Gray's request, the United States Government intends to pay the rents for these accommodations directly to his account at your bank.

Plaintiff alleges that as a result of the assurances provided by the November 30th and January 19th letters, it constructed 19 apartment units in George Town, Bahamas at a cost of $2 million. On July 25, 1990, TCOM, L.P., a government contractor, replaced DESCO as the contractor on the aerostat project. Plaintiff claims that it completed construction of the apartments on or about September 17, 1990. By letter dated September 17, 1990, Mr. Gray wrote to Mr. Cheshes referencing the "U.S. Embassy let-

---

1. As noted above, Mr. Cheshes was the Deputy Chief of Mission at the embassy. The Deputy is the second in command at the embassy, but becomes the "Charge d'affaires," or head of the embassy, if the Ambassador is out of the country, as was apparently the case here.

ter of Intent [of] 30th November, 89." The letter provides, in pertinent part:

> With reference to the apartments which are to be rented for personnel employed at the aerostat site here in Exuma, I would like to take this opportunity of reminding you that we still do not have a contract covering these rentals although we have now reached the stage of starting the painting of the apartments, and we have passed the date of June 1, 1990 as referenced in your letter of intent.

On November 21, 1990, Mr. William Spencer, contracting officer for the U.S. Embassy in the Bahamas, wrote, at Mr. Gray's request, to Mr. A.R. Braynen of the Bank of Nova Scotia, to clarify the previous correspondence regarding "the apartments [Mr. Gray] would like to lease to the U.S. Government." In the letter, Mr. Spencer stated:

> The U.S. Government cannot obligate federal monies beyond the fiscal year, thus all leases for Mr. Gray's housing cannot extend beyond the current fiscal year. The renewal options that exist in the draft lease being discussed assume that TCom will have its U.S. Government contract renewed, and that sufficient funds are appropriated for the project.... So long as Mr. Gray is capable of providing acceptable housing at a fair price, there is no reason to believe that he could not enter into a contractual agreement with the U.S. Government.

After plaintiff completed construction, it entered into a lease agreement for the apartments on February 1, 1991, with TCOM, L.P. for a term of 7 months from March 1, 1991, to September 30, 1991. It appears that TCOM renewed its lease after the end of the 7–month term for another term of months. On January 29, 1992, however, TCOM provided notice to plaintiff that it would terminate the lease agreement on March 1, 1992, because the government was terminating its contract with TCOM at the end of February 1992. On March 1, 1992, plaintiff leased these apartments to another government contractor, Loral Aerospace International, Inc., for a term of 7 months from March 1, 1992, to September 30, 1992. Plaintiff claims that Loral, without notice, vacated the apart-

ments although the aerostat project was still in progress.

Plaintiff claims that after Loral vacated the apartments, defendant failed to honor its purported commitment to provide renters or rent for these apartment units for the balance of the 5 years. Plaintiff filed a lawsuit against defendant in this court, No. 94–408C, which was dismissed for lack of jurisdiction on January 3, 1995. In May 1995, plaintiff submitted a certified claim to the Customs Service, Coast Guard, United States Air Force, and the United States Department of State. After all four agencies denied plaintiff's claim, plaintiff filed the instant action on October 25, 1995, alleging breach of contract and promissory estoppel theories. Defendant has moved to dismiss plaintiffs complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) and for failure to state a claim upon which relief may be granted pursuant to RCFC 12(b)(4). In the alternative, defendant has moved for summary judgment. Plaintiff has filed a cross-motion for summary judgment.

**B. Discussion**

■ Initially, defendant argues that this court lacks jurisdiction because no valid contract exists. However, the Federal Circuit has clearly held that, for this court to have jurisdiction, a valid contract need only be pleaded, not proven. *See Total Medical Management, Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.) ("Although the government argues that jurisdiction is lacking because there was no enforceable contract, the law is clear that, for the Court of Federal Claims to have jurisdiction, a valid contract must only be pleaded, not ultimately proven."), *cert. denied,* —— U.S. ——, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997); *Gould, Inc. v. United States,* 67 F.3d 925, 929 (Fed.Cir. 1995). A valid contract was pleaded here and, therefore, there is no basis for dismissing the complaint under RCFC 12(b)(1).

Alternatively, defendant argues, under RCFC 12(b)(4), that the complaint here fails to state a claim because plaintiff is unable to prove that a valid contract existed between it and the United States. Defendant's motion is, in the alternative, for summary judgment,

and is treated as such here, because it presents matters outside the pleadings that have not been excluded. RCFC 12(b). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■■■ In this procedural posture, the issue before the court is whether a contract arose between the parties. The requirement for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered into the agreement to bind the United States. *Thermalon Indus., Ltd. v. United States*, 34 Fed.Cl. 411, 414 (1995) (*citing City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991)). *See also* 48 C.F.R. 2.101 (1988). These requirements apply to both express and implied-in-fact contracts. *See Trauma Serv. Group v. United States*, 104 F.3d 1321, 1326 (Fed.Cir.1997). Defendant argues that there was no acceptance in this case, and that, at all events, the government representatives alleged to have entered into the agreement lacked the authority to bind the United States. While the acceptance prong of this argument presents questions of fact,[2] the materials before the court clearly indicate, as a matter of law, that the officials who dealt with plaintiff lacked authority to bind the United States in either an express or implied-in-fact contract.

### 1. Choice of Law

Preliminarily, a question arises here as to whether Bahamian or United States law ap-

plies in deciding whether the government officials involved had the requisite contracting authority.[3] The Tucker Act, 28 U.S.C. 1491(a)(1), does not prescribe the law to be applied in suits brought under it. Plaintiff, citing *Al–Kurdi v. United States*, 25 Cl.Ct. 599 (1992), argues that the choice of law should hinge on where the majority of contracting activities took place. As such, it believes Bahamian law should apply here. This assertion is misplaced for several reasons.

■ First, while in some contexts the United States "does business on business terms" and is subject to local law, *United States v. National Exchange Bank*, 270 U.S. 527, 534, 46 S.Ct. 388, 70 L.Ed. 717 (1926), the Supreme Court has held "that obligations to and rights of the United States under its contracts are governed exclusively by federal law." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).[4] This rule is premised on the need to protect the "uniquely federal interest" underlying the statutory and regulatory framework for Federal procurements, in which "[t]he desirability of a uniform rule is plain." *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 87 L.Ed. 838 (1943). This rationale is equally compelling when the alternative to applying Federal law is not state law, but rather foreign law. Accordingly, while cases such as *Boyle*, which reject the application of state law, rather than foreign law, are not squarely on point, those cases, nonetheless, lead to the conclusion that the authority question here should be governed by Federal law.

■ The *Al–Kurdi* decision is not to the contrary. In *Al–Kurdi*, a Jordanian real es-

---

**2.** This is particularly true in the context of whether an implied-in-fact contract existed here and especially as to whether there was acceptance indicated by performance as to such a contract.

**3.** Plaintiff relies on Bahamian law in arguing, *inter alia*, that embassy officials involved here had apparent authority to enter into the purported contract in question.

**4.** See also *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187

(1973); *United States v. Seckinger*, 397 U.S. 203, 209, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); *Prudential Ins. Co. of America v. United States*, 801 F.2d 1295, 1298 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987) ("It is well settled that contracts to which the government is a party—and though a lease may concern and convey a property interest it is also very much a contract—are normally governed by federal law, not by the law of the state where they are made or performed.")

tate agent brought an action against the United States to recover a brokerage commission. The United States, however, argued that Jordanian law should apply to the alleged contract and that under Jordanian law, the contract was unenforceable as it had not been reduced to writing. In deciding whether to apply Jordanian law, the court in *Al–Kurdi* relied on sections 6 and 188 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (RESTATEMENT) (1969). Section 6 provides that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law," and prescribes general factors that courts should consider "[w]hen there is no such directive."[5] Section 188 indicates, more specifically, that the factors relevant under section 6 to the choice of the applicable rule of law in the case of a contract include: (i) the place of contracting; (ii) the place of negotiation; (iii) the place of performance; (iv) the location of the subject matter of the contract; and (v) the domicile, residence, nationality, place of incorporation and place of business of the parties. Applying these factors, the court in *Al–Kurdi* concluded that the law of Jordan, the country with the most significant connection to the alleged brokerage contract, should govern the question whether the contract was required to be in writing.

Obviously, a straightforward application of the contract factors identified in *Al–Kurdi* to this case, as plaintiff urges, would lead to a conclusion that the law of the Bahamas should apply here—the Bahamas was the place of the alleged contracting, negotiation and performance; the apartment units in question were located there and Mr. Gray is a Bahamian citizen. But, *Al–Kurdi* did not involve the question whether the government officials there were authorized to enter into the brokerage contract. Nor, more fundamentally, did it involve a legal question on which there was significant guidance provided by Federal statutes and regulations, as is the case here. Perhaps, this explains why the *Al–Kurdi* opinion did not discuss section 10 of the RESTATEMENT, which provides that while the rules of the RESTATEMENT are "generally applicable to cases with elements in one or more foreign nations," "[t]here may, however, be factors in a particular international case which call for a result different from that which would be reached in an interstate case." *See also* RESTATEMENT 10 cmt. d ("There are significant differences between interstate and international cases.").

Here, such factors call for a result different than would be reached under section 188 of the RESTATEMENT. Indeed, whether an official has the requisite authority to bind the United States seems eminently the type of question that must be resolved by reference to uniform Federal law, rather than variable foreign law. To hold otherwise would be to confer on foreign countries, rather than the United States, the ability to define the powers of United States embassy officials. Such a holding, suspect on its face, would lead to officials in each embassy having different levels of contracting authority—some more, others less—a result that would undercut the strong interest of the Federal government in uniformly defining the duties and responsibilities of its own employees. As will be discussed below, the Congress and the Executive Branch, each exercising their constitutional prerogatives, have gone to great pains to define, with specificity, the contracting authority of various State Department employees, including embassy personnel operating in foreign countries. The very existence of these extensive arrangements belies any notion that the authority of these same employees should instead be defined by reference to foreign law.[6] In these

---

5. The general factors listed in paragraph 2 of section 6 are: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

6. Notably, in *United States v. Seckinger*, 397 U.S. at 209, 90 S.Ct. 880, the Supreme Court indicated that the conclusion that federal law controls the interpretation of a Federal government contract "results from the fact that the contract was entered into pursuant to authority conferred by federal statute and, ultimately by the Constitution."

circumstances, the RESTATEMENT thus does not provide a basis for deviating from the basic principle that the "obligations to and rights of the United States under its contracts are governed exclusively by federal law." *Boyle v. United Technologies Corp.*, 487 U.S. at 504, 108 S.Ct. 2510.[7]

Accordingly, this court will look to Federal law in resolving whether the officials in question had the requisite authority to bind the United States.[8]

### 2. The Officials in Question Lacked the Authority to Bind the United States.

■ "It is well established that a purported agreement with the United States is not binding unless the other party can show that the official with whom the agreement was made had authority to bind the Government." *Mil–Spec Contractors, Inc. v. United States*, 835 F.2d 865, 867 (Fed.Cir.1987) (citation omitted). *See also New America Shipbuilders, Inc. v. United States*, 871 F.2d 1077, 1080 (Fed.Cir.1989). Those who contract with the government bear "the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

Plaintiff argues that the Charge d'affaires of the embassy, Mr. Cheshes, on November 30, 1989, entered into a contract to lease 24 apartment units for 5 years. On that date, Mr. Cheshes wrote Mr. Gray a letter in which he stated: "This letter is to confirm our understanding reference the leasing of housing for Cariball II personnel. The United States Coast Guard and Customs Service intend to lease housing from Sam Gray En-terprises for twenty four individuals for a five year period, upon completion of construction or June 1990, whichever comes first. The United States agrees to the cost as quoted in the original proposal and expects exclusive rights to the specified housing for the full five year period." While the court does not believe that this letter, standing alone, evidenced acceptance of the August 30, 1989, proposal made by Mr. Gray, it does not appear, at all events, that Mr. Cheshes had the authority to bind the United States to such a contract.

Plaintiff argues that Mr. Cheshes had the authority to bind the United States here based on: (i) Federal statutes and regulations that directly conferred that authority upon him; or (ii) a delegation of authority to him by contracting officials at the Coast Guard or the Customs Service. These potential sources of authority will be analyzed seriatim.

### a. Authority deriving from the State Department

Plaintiff claims that Mr. Cheshes' authority to enter into leases of real property derived from two provisions in Title 22 of the U.S.Code: sections 3982(c) and 3902(a)(3). Section 3982(c) provides that the President may assign a career member of the Foreign Service to serve as "charge d'affaires or otherwise as the head of a mission." 22 U.S.C. 3982(c). Section 3902(a)(3), as in effect during the period in question, defined the "chief of mission" as "the principal officer in charge of a diplomatic mission," including "any individual assigned under section 3982(c) of this title to be temporarily in charge of such mission."[9] 22 U.S.C. 3902(a)(3). The import

---

7. This result is also consistent with the general factors to be considered in determining an applicable rule of law under section 6 of the RESTATE-MENT, among which are the "relevant policies of the forum" and the "basic policies underlying the particular field of law." Here, those policies weigh heavily in favor of allowing Federal law to define the authority of United States officials. *Compare United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) ("Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of considerations always relevant to the nature of the specif-ic governmental interests and to the effects upon them of applying state law.'") (*quoting United States v. Standard Oil Co.*, 332 U.S. 301, 310, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947)).

8. It is unnecessary for the court to determine now whether the *Al Kurdi* analysis would require reference to Bahamian law in deciding whether there was acceptance of the offer in this case.

9. Although not cited by plaintiff, 22 U.S.C. § 3927(a) provides that the "chief of mission" to a foreign country shall "have full responsibility for the direction, coordination, and supervision

of these provisions, plaintiff argues, is that Mr. Cheshes, by virtue of his position, was "in charge" of the embassy and, therefore, authorized to enter into the purported lease in question. The second of these propositions, however, does not follow from the first.

Under the Federal Acquisition Regulations (FAR), the only official who has contracting authority by virtue of his or her position is the agency head. *See* 48 C.F.R. 1.601 (1988) ("[a]uthority and responsibility to contract for authorized supplies and services are vested in the agency head.") All other officials with contracting authority receive that authority via delegation from the head of the agency and only those officials so delegated may enter into contracts on behalf of the Government. *Id.* Where such a delegation has not been made, high-ranking officials of agencies—even those that supervise contracting officials—do not themselves possess contracting authority. *See Jascourt v. United States*, 521 F.2d 1406 (Ct.Cl.) (government not bound by the actions of the Deputy Assistant Secretary of Labor for Labor Relations or the Director of the Division of Public Employees), *cert. denied*, 423 U.S. 1032, 96 S.Ct. 562, 46 L.Ed.2d 405 (1975); *Byrne Org., Inc. v. United States*, 152 Ct.Cl. 578, 287 F.2d 582 (1961) (letters of intent issued by the Director and Chief Administrative Officer of the Capital Sesquicentennial Commission not binding); *Gordon Woodroffe Corp. v. United States*, 122 Ct.Cl. 723, 104 F.Supp. 984 (1952) (Special Assistant to the State Department coordinator for aid to Greece and Turkey had no authority to purchase equipment), *cert. denied*, 344 U.S. 908, 73 S.Ct. 328, 97 L.Ed. 701 (1952). *See also* John Cibinic, Jr. & Ralph C. Nash, Jr., FORMATION OF GOVERNMENT CONTRACTS 81–82 (3d ed.1998). Accordingly, Mr. Cheshes did not

have the authority to enter the purported lease contract in question simply by virtue of his position as Charge d'affaires.[10]

Moreover, other provisions in Title 22 specifically defined who within the State Department had the authority to enter into leases of real property. Thus, during the period in question, 22 U.S.C. 291 provided that "[t]he Secretary of State may lease or rent, for periods not exceeding ten years, such buildings and grounds for the use of the Foreign Service, as may be necessary." Section 301 of Title 22 limited the ability of the Secretary to delegate the leasing authority provided by section 291 in the following fashion:

> Notwithstanding the provisions of this chapter or any other Act, no lease or other rental arrangement for a period of less than ten years, and requiring an annual payment in excess of $25,000, shall be entered into by the Secretary of State for the purpose of renting or leasing offices, buildings, grounds, or living quarters for the use of the Foreign Service abroad, unless such lease or other rental arrangement is approved by the Secretary. The Secretary may delegate his authority under this section only to the Deputy Under Secretary of State for Administration or to the Director of the Office of Foreign Buildings.

The legislative history of this provision indicates that it is "designed to insure greater State Department supervision over the execution of short-term leases negotiated abroad." S.Rep. No. 89–1607 (1966) *reprinted in* 1966 U.S.C.C.A.N. 3150.

Section 301 provides further evidence that Mr. Cheshes lacked the authority to enter into the purported lease in question, which would have been for a period of less than 10 years and required an annual payment well in excess of $25,000. Plaintiff, however,

---

of all Government executive branch employees in that country (except for employees under the command of a United States area military commander)."

**10.** Nor is this a case in which the doctrine of "implied actual authority" applies. Under that doctrine, authority to bind the Government is sometimes implied when such authority is considered to be an integral part of the duties assigned to a Government employee. *See H. Landau & Co. v. United States*, 886 F.2d 322 (Fed.

Cir.1989). However, this doctrine applies only when some contracting authority was actually delegated. *See California Sand & Gravel, Inc. v. United States*, 22 Cl.Ct. 19, 27 (1990) ("[A] person with some limited actual authority impliedly may have broader authority. However, a person with no actual authority may not gain actual authority through the court-made rule of implied actual authority."), *aff'd*, 937 F.2d 624, 1991 WL 112816 (Fed.Cir.1991), *cert. denied*, 502 U.S. 1057, 112 S.Ct. 934, 117 L.Ed.2d 105 (1992).

points out that the limitation in Section 301 applies only to leases of buildings "for the use of the Foreign Service abroad" and suggests that this was not the case here because the lease of the buildings in question was never for foreign service personnel. or their living quarters. However, the contract that plaintiff alleges occurred was not necessarily limited to the employees of government contractors and could have, during the alleged 5–year term, included foreign service personnel, thereby making it subject to section 301. Even were this not the case, plaintiff's construction of section 301 appears too narrow. The "for the use of" language in this section does not apply only to buildings in which foreign service personnel are officed or housed, but consistent with the legislative history of the provision, seemingly covers other situations in which leased facilities are more generically "for the use of the Foreign Service." Indeed, plaintiff should not be heard to argue, on the one hand, that Mr. Cheshes acquired his authority to contract here by virtue of his position in the Foreign Service and then to argue, on the other hand, that his exercise of that authority was not subject to limitations placed on leases "for the use of" the Foreign Service. At all events, even if section 301 is inapplicable here, plaintiff has failed to identify affirmatively a statute that authorized Mr. Cheshes to enter into the leases in question.

In terms of regulations, plaintiff relies on 48 C.F.R. 601.603–70(a)(1) (1998), which authorizes overseas posts of the State Department to enter into "contracts . . . to lease real property." However, this regulation was not in force in 1989, but rather was adopted later, in 1994. See 59 Fed.Reg. 66,759 (1994). The version of this regulation that was in effect in 1989, 48 C.F.R. 601.603–70(b)(1) (1988), conspicuously omits any reference to "contracts . . . to lease real property," stating instead "[t]he authority to

enter into and administer contracts for the expenditure of funds involved in the acquisition of supplies, equipment, publications, and services and to sell personal property is delegated to the Principal Officer, the Administrative Officer, and the Principal General Services Officer." Moreover, section 731.3–1 of the 1989 version of the State Department's Foreign Affairs Manual (FAM) specifically provided that leases requiring annual payments in excess of $25,000 "must be approved by the Secretary of State, the Deputy Under Secretary of State for Management, or the Director of the Office of Foreign Buildings Operations," and noted in addition, that "[t]his approval requirement cannot be delegated to Foreign Service posts." FAM 731.3–1 (1989). Accordingly, nothing in these regulations, as they existed in 1989, authorized an embassy Charge d'affaires to enter into contracts for the lease of real property.

b. Authority deriving from another agency.

■ Another possibility exists here—namely, that Mr. Cheshes's contracting authority derived from an appropriate delegation of authority from another agency.[11] Such delegations are authorized by the FAR, which provides explicit authority for a contracting officer to delegate part of his authority to "authorized representatives." 48 C.F.R. 2.101 (1988).[12] Moreover, the State Department's acquisition regulations, in force during the period in question, envisioned such delegations on an interagency basis, providing that "[w]hen expressly authorized by a U.S. Government agency which does not have a contracting officer at the post, the officers named above in . . . [601.603–70(b) ] may enter into contracts for that agency. Use of this authority is subject to the statutory authority of that agency. . . . The agen-

---

**11.** Mr. Gray does not allege, nor is there evidence to support an allegation, that State Department officials charged with the appropriate authority to enter into leases of real property somehow delegated their authority to Mr. Cheshes.

**12.** This section provides: " 'Contracting officer' means a person with the authority to enter into,

administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the contracting officer acting within the limits of their authority as delegated by the contracting officer." 48 C.F.R. § 2.101 (1988). *See also Id.* at 1.602–1(a).

cy's authorization shall cite the statute(s) and state any special contract terms or other requirements with which the acquisition so authorized must comply." · 48 C.F.R. 601.603–70(b)(*l* )(iii) (1988).

Plaintiff argues that such a delegation, in fact, occurred in a November 28, 1989, letter sent by Ernest Wims, a Contracting Specialist at the U.S. Customs Service, which was concurred in by J.A. Nowotny, a Contracting Officer at the U.S. Coast Guard. That letter, however, was not directed to Mr. Cheshes and, indeed, did not mention him by name or position. Rather, the letter was directed to Robert Clark, of the Defense and Electronics Systems Company, then the government contractor on the project in question. The letter states that "[t]he U.S. Customs Service has been requested by the U.S. Coast Guard to direct DESCO to coordinate the acquisition of housing for the Coast Guard through the American Embassy in the Bahamas and to arrange for a letter of intent to be provided by the Embassy to Mr. Gray." By its terms, this statement authorizes DESCO, not Mr. Cheshes, to enter into a lease arrangement with Sam Gray Enterprises.[13] This statement, thus, neither is directed to any embassy official, nor refers to delegated contracting authority (as required by the State Department's acquisition regulations), nor includes any citation to the statutory authority of the purportedly delegating agencies. As such, it falls far short of the "express authorization" to enter into contracts required by the regulation cited above.

Accordingly, it does not appear that Mr. Cheshes had the authority to bind the United States in an express or implied-in-fact contract. Specifically, such authority was neither directly conferred upon him nor delegated thereto.[14]

**13.** Along these lines, the letter further states that "[b]efore finalizing any contractual arrangement with Mr. Gray," DESCO should ensure that three listed features should be "included in any resulting agreement." A November 16, 1989, letter sent by the Coast Guard to Mr. Wims similarly states that "DESCO will continue to be our representative concerning the lease agreement for the operations and maintenance of these units."

**14.** Based on its reading of the relevant statutes and regulations, the court also finds no legal support for plaintiff's claim that James Bumpas,

### 3. Promissory Estoppel

 Finally, plaintiff argues that, even if Mr. Cheshes lacked authority to bind the United States, Mr. Gray relied to his detriment upon the actions and representations of officers of the United States and, as such, may be entitled to recovery. The Supreme Court, however, has made clear that promissory estoppel (contract implied-in-law) will not lie against the Government. *Hercules, Inc. v. United States,* 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) ("[J]urisdiction [based on contract] extends only to contracts either express or implied in fact, and not to claims on contracts implied in law"); *Sutton v. United States,* 256 U.S. 575, 581, 56 Ct.Cl. 477, 41 S.Ct. 563, 65 L.Ed. 1099 (1921); *Trauma Serv. Group,* 104 F.3d at 1327.[15] Accordingly, defendant's promissory estoppel claim also must be rejected.

### CONCLUSION

For the foregoing reasons, defendant's motion to dismiss under RCFC 12(b)(1) for lack of subject matter jurisdiction is denied. Defendant's motion under RCFC 12(b)(4) and, by the inclusion of matters outside the pleadings, converted to one for summary judgment under RCFC 56, is allowed; plaintiff's cross-motion for summary judgment is denied.

the narcotics officer at the embassy, possessed the requisite authority to bind the United States, either by virtue of his position or via delegation.

**15.** The same result would obtain if plaintiff's arguments were construed as raising the doctrine of equitable estoppel, particularly as there is no indication of affirmative misconduct in this case. *See OPM v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990); *Heckler v. Community Health Servs., Inc.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984).